IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **AMEC CONSTRUCTION MANAGEMENT, INC.**<br>**(f/k/a/ Morse Diesel International, Inc.)**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant.** | **No.: 06-867**<br>**(Judge Braden)** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR IN CAMERA INSPECTION AND A PROTECTIVE ORDER AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION TO COMPEL**

AMEC Construction Management, Inc. ("ACMI") respectfully submits its memorandum in opposition to Defendant's motion for *in camera* inspection and protective order. In addition, Plaintiff cross-moves to compel the production of the performance evaluation documents. The documents at issue are performance evaluations of key current and former GSA employees who participated in the decisions that culminated in the Government's ever-changing excess reprocurement claims against ACMI. For example, these documents are relevant to ACMI's defense as they may further illuminate the unreasonableness of the decisions made during the Phase III project and in the calculation of the reprocurement claims. Therefore, ACMI requested, under Rule 34 of the Rules of the Court of Federal Claims ("RCFC"), that the government produce them. The government has refused to do so, citing non-existent privileges and relying on the government's delay in bringing this action in an attempt to demonstrate a lack of relevance. These documents are relevant and subject to no privilege. In fact, given the Protective Order currently in place in this case, the production of those documents will cause no

privacy concern at all. Therefore, ACMI respectfully moves the Court, under RFCF 37, to compel production and requests that the government's motion for *in camera* inspection and for a protective order be denied.

On July 3, 2007, this Court entered a Protective Order (Docket Entry #15). That Order already provides safeguards to protect any privacy concerns and expressly applies to information in government files protected by, *inter alia*, the Privacy Act. Protective Order ¶ (1)(A). Apparently, the government is willing to produce the information but wants to prohibit counsel for ACMI from informing its client ACMI about the information in the documents and materials. The government offers no justification for a proposal to preclude counsel for a party from sharing information with the party when both the party and its counsel are bound by the confidentiality requirements of the Protective Order. Nor does the government have any justification for its surprising request because the Order already provides that information designated confidential may be used "only for the purposes of litigation." Protective Order ¶ (3). The Order further provides that "[e]ach person receiving confidential information shall maintain such confidential information in his or her possession in a manner sufficient to protect such information against unauthorized disclosure." *Id.* Thus, both ACMI and its counsel are obliged by the Order to protect the confidentiality of any designated confidential information produced by the government.

This is an excess reprocurement claim case. In June 1999, the General Services Administration ("GSA" or government) terminated ACMI[1] as the contractor on the Phase II

[1] At that time, Plaintiff ACMI was known by its prior name Morse Diesel International, Inc. For ease of reference, ACMI is used to refer to the contractor throughout this filing regardless of its name at the time of the specific events discussed.

Project for construction of the Thomas Eagleton U.S. Courthouse in St. Louis, Missouri, and then the GSA chose to complete the construction project itself. The Courthouse was determined to be "substantially complete" in May 2000.

Approximately six years after substantial completion, in March 2006, the GSA Contracting Officer for the Courthouse project assessed claims for "excess reprocurement costs" against ACMI totaling in the range of $30 million. The Contracting Officer twice revised her calculations in 2006, once in May 2006 and later in October 2006, with the amount of the claim fluctuating around $30 million. As required by statute, ACMI filed suit to contest the assessment in December 2006.[2] In April 2007, the Contracting Officer announced that she intended to revise the claim and indicated a revised claim would issue in June 2007. The Contracting Officer finally issued a revised claim in August 2007 in the amount of approximately $17.3 million, a more than 40% reduction in the amount of the claim. On September 19, 2007, this Court granted leave for ACMI to amend its Complaint to challenge the August 2007 calculation as well. In July 2008, the Contracting Officer announced yet another revision of the government's claim, increasing the amount to approximately $18 million. This revision occurred after ACMI had already deposed three witnesses involved in some of all of the prior four calculations.

The government claims to have spent more than $51 million to complete the Courthouse after ACMI was terminated. Various subtractions by the government (including the amount left unpaid on the fixed-price Phase II project and some costs that the government acknowledges

[2] ACMI is required to appeal the assessment by filing an action in this Court or one of the Boards of Contract Appeals. Thus, ACMI is the Plaintiff here, even though it is not seeking money from the government. Rather ACMI is challenging the government's claim against it.

were not within the scope of the Phase II contract) reduce the amount of the claims brought against ACMI currently to $18 million. Thus, the choices made by GSA officials when they ran the Phase III project are central to ACMI's defense against the government's claim. Shortly before ACMI was terminated in June 1999, the government obtained, in April 1999, an assessment of the Phase II project status from CRSS/Jacobs Engineering. The Jacobs assessment indicated that only approximately $25 million in work was left to be done to complete Phase II. At the time of this assessment, approximately $25 million had not yet been paid from the Phase II fixed-price contract. ACMI assumes that this Jacobs assessment, in part, induced the GSA to terminate ACMI and takeover running the construction itself. Curiously, as much as six months later, in November 1999, Jacobs told the GSA that the cost of completion for the Phase III project had increased only minimally to $28.7 million. In essence, then, it appears that the budget for the Phase III project ballooned by another $23 million to more than $51 million between November 1999 and substantial completion of the project in May 2000. Such a massive increase (nearly 100% increase) certainly gives ACMI good cause to suspect that the $51 million total cost for Phase III and especially the $18 million claim asserted against ACMI (derived from the $51 million costs) is not, in fact, "excess reprocurement costs" but rather costs and charges not included in the original GSA-ACMI Phase II contract and thus not properly charged to ACMI at all.

Because GSA officials ran the construction during Phase III and the government's claim is based on the construction activity during Phase III, evaluation of the actions of the GSA officials during Phase III is a significant part of this case. To prevail on its claim, the government must prove that (i) the GSA properly terminated ACMI for delay, (ii) that the costs GSA seeks to assess as ""excess reprocurement costs" are, in fact, costs for work that was within

the scope of the original GSA-ACMI Phase II contract, and (iii) the GSA actually incurred the "excess costs" and the GSA acted reasonably to minimize the excess costs resulting from the default (reasonable time, using the most efficient method of reprocurement, obtaining a reasonable price and mitigating its losses). *See generally Cascade Pac. Int'l v. United States*, 773 F.2d 287, 293-94 (Fed. Cir. 1985). It is not surprising, therefore, that ACMI would want to examine the activities of the GSA employees leading up to the Phase II termination and during Phase III. Work evaluations of the GSA employees provides relevant and contemporaneous information about the GSA's decisions during the Phase II and Phase III projects.

The Government's actions concerning the St. Louis Courthouse project in general are central to this case. These matters include the GSA employee's decisions regarding (i) the termination of ACMI; (ii) the decision not to use the surety to complete construction; (iii) the unmanaged and unmitigated reprocurement costs during Phase III (including the use of a large number of multimillion time and materials contracts in Phase III instead of fixed-price contracts as used in Phase II); (iv) the shifting of responsibilities to incompetent and self-interested third-parties; and (v) the GSA's fluctuating claims against ACMI since 2006. The GSA is now trying to shift the costs of its employees' multiple poor decisions onto ACMI.

ACMI, on the other hand, is being forced to battle a moving target as the government continuously changes the amount and method of its calculation of the claimed costs. Despite the fact that RCFC 26(a)(1) clearly specifies that "a party must . . . provide to other parties: . . . a computation of any category of damages claimed by the disclosing party, making available for inspection and copying . . . the documents . . . on which such computation is based . . . within

14 days after the filing of the Joint Preliminary Status Report[3]" the government has acknowledged that -- as of the beginning of July 2008 at least -- the government had not done so correctly. Instead, the government has issued at least four separate flawed demands with amounts claimed spanning from $17.3 million to $31.7 million. *See* March 21, 2006 Letter from G. Butler; May 1, 2006 Letter from G. Butler; October 10, 2006 Letter from G. Butler; August 9, 2007 Letter from G. Butler (Exhibits 1, 2, 3, and 4). Earlier this month, on July 2, 2008, the government issued a fifth calculation, this time asserting that the excess reprocurement claim against ACMI is approximately $18 million. *See* July 2, 2008 Letter from G. Butler (attached as Exhibit 5). During discovery taken so far, ACMI has also found several drafts of claims where the amount owed is listed as only $10 million.[4] It is telling that the documents and back-up calculations provided by the government to support each of these demands are also inconsistent. The government is not changing one number each time, but also changing its entire method of calculation. Apparently, the government has absolutely no idea how much ACMI owes, even by its own theories.

It is obvious that the government is extremely disorganized with regard to the Phase III construction work and the GSA's reprocurement calculations. But, it is difficult, from ACMI's perspective, to identify the sources of the GSA's unreasonable disorganization. If the government has itself recognized the source of these problems, in particular, through its evaluation of the GSA employees who were involved in the Phase II and Phase III events, ACMI has the right to know that information.

---

[3] The Joint Preliminary Status Report was filed on April 13, 2007.

[4] To avoid burdening the Court with a number of exhibits and due to confidentiality protections in the Protective Order, ACMI does not attach the documentary information as an Exhibit, but will provide the information to the Court under seal if the Court wishes to see it.

The issue here is not just the calculation itself, but the reasonableness of the decisions by GSA employees during the Courthouse project that led to the unnecessarily exorbitant costs of reprocurement in Phase III and to the assessment of those costs to ACMI. ACMI must be allowed to determine if the government itself recognized problems with those decisions and the work done by the employees who made those decisions. Therefore, ACMI has a right to review the evaluation information in the personnel files of key decision-makers during Phase II and Phase III as well as those involved in the now five different calculations of excess reprocurement claims.

Each of the employees identified in ACMI's requests played key roles in the decisions that led to these calculations, if not in the calculations themselves. Many of them were identified by the government as key personnel in its Rule 26(a)(1) disclosures, and several were mentioned in the government's lengthy interrogatory responses.[5] Each of them was mentioned over a hundred times in the documents produced by the government in this case; some were mentioned more than 20,000 times. All of them played key roles in these decisions, despite the fact that their titles may not make that apparent.

One consistent theme that ACMI has found during discovery in this case is that the Government has blurred the lines between the roles of the GSA employees working on this project. For instance, Mr. Walsh was an auditor on the Phase II and III projects, but he was also used as an expert witness.[6] Similarly, Martin Hom, a GSA in-house attorney working on aspects

---

[5] To avoid burdening the Court and to protect any confidential information found therein, ACMI does not include those lengthy discovery materials as exhibits but will provide them to the Court upon request.

[6] The Government's statement that "there is no evidence" of Mr. Walsh's involvement in termination of ACMI or reprocurement matters, Government Motion at 6-7, is certainly not

(continued...)

of the St. Louis Courthouse project in the 1990s, was hired to calculate the reprocurement costs after he left the Government. Jacobs Engineering (formerly CRSS) was responsible for the April 1999 estimate (before ACMI was terminated) that the costs to complete the Project would be in the range of $25 million, the contract amount not yet spent at that time. After ACMI was terminated, Jacobs's role as contract manager expanded, once the GSA chose not to use the surety complete the project. Later, Jacobs helped determine the $51 million total cost to complete (more than 100% greater than Jacobs's own April 1999 estimate and mid-Phase III project November 1999 assessment) and the excess reprocurement claim that ACMI should pay more than $17.3 million. The self-interest is obvious: before termination Jacobs had every reason to minimize the estimate to complete so ACMI would be terminated and Jacobs could expand its role as contract manager; once the Project had finished and the GSA had vastly overspent to the tune of more than $51 million, Jacobs would want to assist the government's assertions that $17.3 million of the $51 million was due to "excess reprocurement costs" that could be recovered from ACMI.

ACMI has found that many of the GSA employees wore more than one hat, so their roles cannot be determined solely by their titles. Evaluations of their performance also can help describe the roles they actually filled and, more importantly, whether the GSA recognized that their decisions were flawed. ACMI seeks only information about the employees that were key decision-makers in the events.

The following describes the roles of multiple GSA employees in the Courthouse project.

---

(...continued)

consistent with the many documents ACMI has found mentioning Mr. Walsh's work related to Phase III. Moreover, the government's own RCFC 26(a)(1) disclosure specifically identified Mr. Walsh as a GSA-OIG employee involved in Phase III (he is listed first in the GSA-OIG grouping).

1. Georgann Butler was the Contracting Officer on Phase III of the project who issued all of the five different demands and final decisions regarding the reprocurement costs. As such, she participated in the assembly of the back-up spreadsheets that purportedly support those changing decisions. Ms. Butler also participated in the authorization of certain time and materials contracts (instead of fixed-price contracts) with major subcontractors during Phase III, which now account for a majority of the costs being assessed. Ms. Butler is therefore a central Government witness on the amount of excess construction costs. As the Government is only entitled to recover reasonable excess costs of reprocurement, Ms. Butler's performance evaluations may provide insight into the Government's view of how reasonably Ms. Butler controlled construction costs during Phase III.

2. Karen Poole was a Contracting Officer during both Phase II and Phase III of the project. Her work was also used in assembling at least some versions of the Government's excess reprocurement calculations. Therefore, for the same reasons advanced above as to the relevance of Georgann Butler's evaluation, Ms. Poole's performance evaluations are quite relevant to this action.

3. Linda Derby and Anne Anderson were both Contracting Officers on Phase I and Phase II of the project. During those portions of the project serious delays occurred as a result of, *inter alia*, environmental contamination at the site, poor performance by the government's architect HOK, and delay by GSA staff and consultants in review and evaluation of request for changes from ACMI during Phase I and II. Delay was the basis for the government's termination of ACMI and so the GSA's or its consultants' contribution to the delay problem could establish that the government's claim of delay is flawed. In addition, delays caused by poor performance by the architect and others likely continued into Phase III of the project,

unfairly increasing the claims assessed against ACMI. Ms. Derby's and Ms. Anderson's performance evaluations may provide insight into the Government's view of their performance on the project and their reaction to the delays caused by the GSA and the architect HOK's inadequate plans. If their superiors did not think that they were properly managing these issues, then it would be unreasonable for ACMI to be charged for those shortcomings.

4. John Walsh worked as an auditor on several of the Phase III subcontracts, including contracts which involved costly time and material expenditures. Additionally, Mr. Walsh was involved with the negotiations of the Phase III contracts, and he was responsible for collecting a significant amount of the data that was to be used in the reprocurement calculations. Mr. Walsh seemed to serve at times as a liaison between the GSA and the DOJ with regard to both the reprocurement efforts and the calculations. If his superiors believed Mr. Walsh either to be working outside the scope of his position and interfering with the reprocurement process or just not performing these tasks reasonably, that would affect whether ACMI could be held responsible for the costs assessed as a result.

5. Steven Anderson was an investigator for the GSA's Office of the Inspector General who participated in the investigations during Phases I and II of the project, discovery has also revealed that Mr. Anderson attended strategy and funding meetings during Phase III of the project. His personnel files might also shed light on exactly why he became so involved in this project and how much influence he had over the reprocurement process, and whether the Government believed that influence to be appropriate and reasonable.

6. Myron Goldstein was also a key player in the reprocurement process. He was the initial Project Manager on Phase I of the project and ultimately became the Director of the region's GSA Project Management Division, and thus the superior of the Contracting Officers

and others listed above. As a senior GSA executive, Mr. Goldstein held regular meetings with ACMI senior executives during Phase II. Mr. Goldstein participated in the decisions to terminate for default during Phase II. At that time, the April 1999 independent estimate of costs to complete the project indicated that the costs would be within the range of the unspent amount of the contract – which would mean "excess reprocurement costs" would be minimal or non-existent. Mr. Goldstein's performance evaluations may indicate whether the Government believed that he was acting responsibly in making decisions or supervising other decision-makers who made the decisions that led to skyrocketing reprocurement costs. As ACMI can only be subject to liability for reasonable actions by the GSA employees, ACMI has a right to know whether the government itself believed that Mr. Goldstein, or any of the other key personnel, was acting unreasonably.

The government's motion refers to retirement dates, and even dates of death, to claim that these employees could not be relevant to the current proceedings is also a red herring. Such an argument proves nothing more than that the government's six (6) year delay in asserting its claim has made this litigation extremely difficult. Many of the decisions at issue in this case were made nine (9) or more years ago. The fact that the GSA employees who made those decisions have since retired, or even died, is entirely irrelevant to the reasonableness of their decisions at the time. ACMI needs to know if the decision-makers and their decisions were criticized contemporaneously by GSA superiors, regardless of the employees' present status at GSA. Evaluations in personnel files are a relevant source for contemporaneous understanding of the internal views of the quality of the employees' judgments during the Courthouse project and the later effort to calculate the ever-changing excess reprocurement claims.

The government's argument regarding the need for confidentiality ignores the Protective Order already entered in this case. The government does not explain its assertion of privilege and points only to the Privacy Act. There is no Privacy Act privilege. As the DC Circuit explained in *Laxalt v. McClatchy*, 809 F.2d 885, 888-89 (D.C. Cir. 1987), "a party can invoke discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards, and the test of discoverability is the relevance standard of Rule 26(b)(1)." Moreover, "the Privacy Act . . . does not create a qualified discovery privilege . . . [n]or does the Act create any other kind of privilege or bar that requires a party to show actual need as a prerequisite to invoking discovery." *Id.* *See also Pippinger v. Rubin*, 129 F.3d 519, 532 (10th Cir. 1997) (explaining how documents arguably protected by the Privacy Act are considered "non-privileged"). The Privacy Act requires that care be given to the privacy concerns associated with specific types of documents. In this instance, the requisite care is already recognized: this Court's Protective Order specifically covers documents that are subject to the Privacy Act. Therefore, there is no need to withhold production at this time.

There can be little doubt that in a case between private parties involving a construction project of this magnitude, employee evaluations would be relevant discovery. In such a case, the Protective Order respecting confidentiality of the information would be sufficient. The Privacy Act does nothing to change the relevance of the information to discovery. The existing Protective Order ensures that Privacy Act rights are respected and enforced by parties and counsel. That is all that is required by that Act. This Court does not need to perform an *in camera* review to resolve this motion and no further protective order is required.

For all of the foregoing reasons, ACMI respectfully requests that the Court deny the government's motion for *in camera* inspection and protective order and grant ACMI's cross-motion to compel the production of the documents, subject to the appropriate confidentiality protections under the existing Protective Order.

Respectfully submitted,

s/ James D. Wareham

JAMES D. WAREHAM
Paul, Hastings, Janofsky & Walker LLP
875 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: 202-551-1728
Fax: 202-551-0128
Attorney of Record for Plaintiff

Of Counsel:
Kirby D. Behre
Danielle W. Pierce
Paul, Hastings, Janofsky & Walker LLP
875 Fifteenth Street, N.W.
Washington, D.C. 20005

July 25, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this 25th day of July 2008 I caused a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion For In camera Inspection And a Protective Order And In Support of Plaintiff's Cross-Motion to Compel to be served by ECF upon counsel for the Defendant as follows:

Dominique Kirchner
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530

/s/Danielle Pierce
Danielle Pierce

LEGAL USE 79997381.3