UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMEC CONSTRUCTION MANAGEMENT, INC., f/k/a Morse Diesel International, Inc., Plaintiff, v. THE UNITED STATES, Defendant. | Case No. 06-867 |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

In accordance with Rules 26, 33, and 34 of the Rules of the Court of Federal Claims ("RCFC"), Amec Construction Management, Inc. ("ACMI") provides the following responses to defendant's second interrogatories and request for production of documents, which was dated May 24, 2008, and served on June 17, 2008.

**GENERAL OBJECTIONS**

1. These Responses are made without waiver of:

a. Any and all objections on the grounds of competency, relevancy, materiality, privilege, work product, admissibility as evidence, for any purpose of the subject matter thereof;

b. The right to object to the use of any documents produced or information provided hereunder in any subsequent proceeding or in the trial of this or any other litigation or arbitration;

c. The right to object on any ground at any time to a demand for further



7/7/2008

response to these or any other interrogatories or document requests in this arbitration or litigation.

2. The disclosure of information and/or the production of any document in response to these Interrogatories and Requests shall not constitute an admission of the authenticity, relevance, materiality, or admissibility of such document or information, and Plaintiff hereby expressly preserves all objections to the use of documents and/or information and/or to further production.

3. Plaintiff has not completed its investigation relating to this action, has not completed discovery in this action, and has not completed preparation for trial. As discovery proceeds, facts, information, evidence, documents and things may be discovered that are not set forth in these responses, but which may have been responsive to Defendant's Interrogatories and Requests. The following responses are based on Plaintiff's knowledge, information and belief at this time and are complete as to Plaintiff's best knowledge at this time. Plaintiff reserves the right to supplement these responses in accordance with Rule 26(e) of the Rules of the Court of Federal Claims ("RCFC"). Furthermore, these responses were prepared based on Plaintiff's good faith interpretation and understanding of the individual Interrogatories and Requests and are subject to correction for inadvertent errors or omissions, if any. These responses are given without prejudice to subsequent revision or supplementation based upon any information, evidence and documentation that hereinafter may be discovered. Defendant reserves the right to refer to, to conduct discovery with reference to, or to offer into evidence at the time of trial, any and all facts, evidence, documents and things developed during the course of discovery and

trial preparation, notwithstanding the reference to facts, evidence, documents and things in these responses.

4. Plaintiff objects generally to the Requests to the extent that any Request seeks documents which will or have already been produced by either Plaintiff or Defendant or which have been identified as exhibits to any depositions in this action, and Plaintiff declines to produce or identify such documents.
5. Plaintiff objects generally to each Interrogatory and Request to the extent each calls for the production of documents, or disclosure of information, that are protected from disclosure by the attorney-client privilege, the work product doctrine, the common interest privilege, the joint defense privilege, the protection provided by RCFC 26(b)(4)(B), or any other applicable privilege, protection, or immunity.
6. Plaintiff objects generally to the Interrogatories and Requests to the extent they seek disclosure of matters that are not relevant to the subject matter of the pending action and are not reasonably calculated to lead to relevant evidence.
7. Plaintiff objects generally to the Interrogatories and Requests on the grounds that they are vague, ambiguous, lacking in particularity, over broad and unduly burdensome.
8. Plaintiff objects generally to the Interrogatories and Request on the grounds that the Government's extremely long passage of over six years time between the relevant events and the four final decisions and revised final decisions of the contracting officer at the U.S. General Services Administrations ("GSA") and this Subpoena has caused undue burden in locating the relevant documents and people who remember the relevant events.
9. Plaintiff objects generally to the Interrogatories and Requests to the extent they call

for the production of documents or information that are not within the possession, custody or control of ACMI/MDI or that are equally available or accessible to Defendant.

10. Plaintiff objects generally to the Interrogatories and Requests to the extent that they seek to impose upon Plaintiff any requirements beyond those established by the RCFC.

11. Plaintiff objects generally to the Requests to the extent that they seek metadata for electronic documents as such a production would be overbroad, unduly burdensome, and not reasonably calculated to lead to admissible evidence. In addition, Plaintiff objects to the instruction to "produce all electronic documents and emails in electronic format with all original metadata preserved and intact as originally created." Plaintiff will produce documents as they have been kept in the usual course of business by ACMI, which, for the most part, is in paper format. Moreover, due to the defendant's inordinate delay in stating its claims and due to changes in computer technology, plaintiff is not able to readily produce historic electronic materials and metadata without undue burden or expense.

12. Plaintiff reserves the right to amend or supplement these responses through and including the time of trial or arbitration.

**RESPONSES TO INTERROGATORIES**

Interrogatory No. 1: Identify all information and describe in detail, including providing copies of all relevant documents, all facts relating to how much each of the subcontractors was owed by ACMI for Phase II work as of the June 16, 1999 termination for default of ACMI.

Response to Interrogatory No. 1: Plaintiff ACMI restates the General Objections set forth above

and incorporates them by reference into this Response. ACMI has had difficulty responding to this Interrogatory due to the passage of time since the events in 1999. In addition, as is well known to Defendant United States ("Government"), most of the knowledgeable employees have left ACMI making it difficult to capture in June 2008 the information sought in this Interrogatory about events more than nine (9) years ago. The Government's inordinate delay in asserting its claim in this matter has contributed to the dearth of readily available information to respond to this Interrogatory. ACMI has done its best to obtain information to respond to this Interrogatory within the time allowed under the Rules. ACMI reserves its right to modify or amend its response if additional information becomes available.

ACMI submitted to the U.S. General Services Administration ("GSA") a Claim for Payment in June 2005. In that Claim, ACMI described the status (as of 2005) of claims made by subcontractors to ACMI for the work the subcontractors performed under the Phase 2 contract in June 1999. As part of its response and in accordance with RCFC 33(d), ACMI incorporates the information from the June 2005 Claim for Payment, which has been previously provided to the Government. In addition, ACMI notes that the GSA required those Phase 2 subcontractors with whom the GSA entered into direct contracts for the so-called Phase 3 Project to identify in their initial invoices under the Phase 3 contract the work the entity had performed in June 1999 as subcontractors under the Phase 2 contract. ACMI refers the Government to those GSA records as additional evidence responsive to this Interrogatory, with the caveat that ACMI only recently has received access to those records and cannot vouch for the accuracy of the representations made by those entities in those Phase 3 invoices.

Interrogatory No. 2: Identify all information and describe in detail, including providing copies of

all relevant documents, all facts relating to how much each of the subcontractors was owed by ACMI for work included in the ACMI's May billing, which was not processed by GSA, and whether that amount for each subcontractor is the same as or different from the amount stated in the August 6, 1999 letter of Graham Harwood (copy attached [to Interrogatories]), and the reasons therefore.

Response to Interrogatory No. 2: Plaintiff ACMI restates the General Objections set forth above and incorporates them by reference into this Response. ACMI has had difficulty responding to this Interrogatory due to the passage of time since the events in 1999 including the events referenced in the August 6, 1999 letter of Graham Harwood. In addition, as is well known to Defendant United States ("Government"), most of the knowledgeable employees (including Mr. Harwood) have left ACMI making it difficult to capture in June 2008 the information sought in this Interrogatory about events more than nine (9) years ago. The Government's inordinate delay in asserting its claim in this matter has contributed to the dearth of readily available information to respond to this Interrogatory. ACMI has done its best to obtain information to respond to this Interrogatory within the time allowed under the Rules. ACMI reserves its right to modify or amend its response if additional information becomes available.

As is well-known to the U.S. General Services Administration ("GSA"), Mr. Harwood's letter was prepared at a time shortly after the June 16, 1999 termination of ACMI. The GSA had initially prevented ACMI and its staff from having access to the ACMI files at the jobsite, although ultimately ACMI was permitted to collect its files. ACMI believes that Mr. Harwood made a good faith effort to describe in the August 9, 1999 letter the amounts owed to Phase II subcontractors based upon the May 1999 billings that had been submitted to the Government. The GSA has access its own copy of the May 1999 invoices as well as its own files related to the construction at that time and the information provided to it by the Phase II subcontractors with

respect to their work in May 1999. In addition, ACMI has provided documents to the GSA from which this information can be derived. The Interrogatory attempts to impose upon ACMI the undue burden of re-creating nine (9) years after the events took place a series of complicated and detailed calculations without ready access to multiple knowledgeable former employees whose own memories may have faded with respect to this specific event. Therefore, pursuant to RCFC 26 and 33, ACMI declines to provide any further answer to this Interrogatory.

**RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant's First Interrogatories and Request for Production of Documents
Request No. 1:

Produce all documents identified or relied upon in preparing your responses to the Defendant's First Interrogatories

Response: Plaintiff incorporates the general objections stated above. Plaintiff also objects because this Request is ambiguous, overbroad, not reasonably calculated to lead to discovery of relevant evidence, and unduly burdensome. Additionally, Plaintiff objects because the extremely long passage of over six years time between the creation of any such documents and the four final decisions and revised final decisions of the contracting officer at the U.S. General Services Administrations ("GSA") and this Request has made such a production even more burdensome. Subject to these objections, Plaintiff will produce those non-privileged documents, if any, that it is able to locate that are responsive to this request.

Respectfully submitted,

James D. Wareham by Danielle Pierce

James D. Wareham, Attorney of Record
for Plaintiff
Kirby D. Behre
Danielle W. Pierce
Paul, Hastings, Janofsky & Walker LLP
875 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: 202-551-1728
Fax: 202-551-0128

Date: July 17, 2008
LEGAL USE 80212723.1

CERTIFICATE OF SERVICE

I hereby certify that I caused to be served by email and U.S. mail this 17th day of July 2008 a copy of the foregoing Plaintiff's Responses to Defendant's Second Request for Production of Documents upon:

Domenique Kirchner
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. DEPARTMENT OF JUSTICE
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530

Danielle W. Pierce

LEGAL_US_E # 80212723.2 37903.00006

**Verification**

I, Ronni Brenner, am Senior Vice President of Plaintiff AMEC Construction Management, Inc. I have read the foregoing Plaintiff's Response to Defendant's First Interrogatories and believe in good faith the same to be true and correct based on either the records of the Plaintiff, my own knowledge, or information supplied by others which I believe to be true and correct. Subject to the foregoing and pursuant to 28 O.K. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7/18/08
Date

AMEC Construction Management, Inc.

By: Ronni Brenner
Senior Vice President



[redacted]

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMEC CONSTRUCTION MANAGEMENT, INC., f/k/a Morse Diesel International, Inc., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06-867 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S SECOND INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

In accordance with Rules 26, 33, and 34 of the Rules of the Court of Federal Claims ("RCFC"), Amec Construction Management, Inc. ("ACMI") provides the following responses to defendant's second interrogatories and request for production of documents, which was dated May 24, 2008.

**GENERAL OBJECTIONS**

1. These Responses are made without waiver of:

a. Any and all objections on the grounds of competency, relevancy, materiality, privilege, work product, admissibility as evidence, for any purpose of the subject matter thereof;

b. The right to object to the use of any documents produced or information provided hereunder in any subsequent proceeding or in the trial of this or any other litigation or arbitration;

c. The right to object on any ground at any time to a demand for further response to these or any other interrogatories or document requests in this



6/23/2008

arbitration or litigation.

2. The disclosure of information and/or the production of any document in response to these Interrogatories and Requests shall not constitute an admission of the authenticity, relevance, materiality, or admissibility of such document or information, and Plaintiff hereby expressly preserves all objections to the use of documents and/or information and/or to further production.

3. Plaintiff has not completed its investigation relating to this action, has not completed discovery in this action, and has not completed preparation for trial. As discovery proceeds, facts, information, evidence, documents and things may be discovered that are not set forth in these responses, but which may have been responsive to Defendant's Interrogatories and Requests. The following responses are based on Plaintiff's knowledge, information and belief at this time and are complete as to Plaintiff's best knowledge at this time. Plaintiff reserves the right to supplement these responses in accordance with Rule 26(e) of the Rules of the Court of Federal Claims ("RCFC"). Furthermore, these responses were prepared based on Plaintiff's good faith interpretation and understanding of the individual Interrogatories and Requests and are subject to correction for inadvertent errors or omissions, if any. These responses are given without prejudice to subsequent revision or supplementation based upon any information, evidence and documentation that hereinafter may be discovered. Defendant reserves the right to refer to, to conduct discovery with reference to, or to offer into evidence at the time of trial, any and all facts, evidence, documents and things developed during the course of discovery and trial preparation, notwithstanding the reference to facts, evidence, documents and

things in these responses.

4. Plaintiff objects generally to the Requests to the extent that any Request seeks documents which will or have already been produced by either Plaintiff or Defendant or which have been identified as exhibits to any depositions in this action, and Plaintiff declines to produce or identify such documents.

5. Plaintiff objects generally to each Interrogatory and Request to the extent each calls for the production of documents, or disclosure of information, that are protected from disclosure by the attorney-client privilege, the work product doctrine, the common interest privilege, the joint defense privilege, the protection provided by RCFC 26(b)(4)(B), or any other applicable privilege, protection, or immunity.

6. Plaintiff objects generally to the Interrogatories and Requests to the extent they seek disclosure of matters that are not relevant to the subject matter of the pending action and are not reasonably calculated to lead to relevant evidence.

7. Plaintiff objects generally to the Interrogatories and Requests on the grounds that they are vague, ambiguous, lacking in particularity, over broad and unduly burdensome.

8. Plaintiff objects generally to the Interrogatories and Requests to the extent they call for the production of documents or information that are not within the possession, custody or control of ACMI/MDI or that are equally available or accessible to Defendant.

9. Plaintiff objects generally to the Interrogatories and Requests to the extent that they seek to impose upon Plaintiff any requirements beyond those established by the RCFC.

10. Plaintiff objects generally to the Requests to the extent that they seek metadata for

electronic documents as such a production would be overbroad, unduly burdensome, and not reasonably calculated to lead to admissible evidence. In addition, Plaintiff objects to the instruction to "produce all electronic documents and emails in electronic format with all original metadata preserved and intact as originally created." Plaintiff will produce documents as they have been kept in the usual course of business by ACMI, which, for the most part, is in paper format. Moreover, due to the defendant's inordinate delay in stating its claims and due to changes in computer technology, plaintiff is not able to readily produce historic electronic materials and metadata without undue burden or expense.

11. Plaintiff reserves the right to amend or supplement these responses through and including the time of trial or arbitration.

## RESPONSES TO INTERROGATORIES

Interrogatory No. 3: Identify all information and describe in detail, including providing copies of all relevant documents, all facts relating to how much each of the subcontractors was owed by ACMI for work they performed during the period June 1 to June 16, 1999.

Response to Interrogatory No. 3: Plaintiff ACMI restates the General Objections set forth above and incorporates them by reference into this Response. ACMI has had difficulty responding to this Interrogatory due to the passage of time since the events in 1999. In addition, as is well known to Defendant United States ("Government"), most of the knowledgeable employees have left ACMI making it difficult to capture in June 2008 the information sought in this Interrogatory about events nine (9) years ago. The Government's inordinate delay in asserting its claim in this matter has contributed to the dearth of readily available information to respond to this Interrogatory. ACMI has done its best to obtain information to respond to this Interrogatory within the time allowed under the Rules. ACMI reserves its right to modify or

amend its response if additional information becomes available.

ACMI submitted to the U.S. General Services Administration ("GSA") a Claim for Payment in June 2005. In that Claim, ACMI described the status (as of 2005) of claims made by subcontractors to ACMI for the work the subcontractors performed under the Phase 2 contract in June 1999. As part of its response and in accordance with RCFC 33(d), ACMI incorporates the information from the June 2005 Claim for Payment, which has been previously provided to the Government. In addition, ACMI notes that the GSA required those Phase 2 subcontractors with whom the GSA entered into direct contracts for the so-called Phase 3 Project to identify in their initial invoices under the Phase 3 contract the work the entity had performed in June 1999 as subcontractors under the Phase 2 contract. ACMI refers the Government to those GSA records as additional evidence responsive to this Interrogatory, with the caveat that ACMI only recently has received access to those records and cannot vouch for the accuracy of the representations made by those entities in those Phase 3 invoices. Moreover, the Government has recently provided ACMI with Interrogatories No. 1 and No. 2 in this case (which were not served on ACMI until June 16, 2008), which also addresses the issue raised in this Interrogatory. ACMI is in the process of preparing its response to those Interrogatories and may provide further information responsive to this Interrogatory when it responds to those Interrogatories.

**RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

Request No. 1: Produce all documents identified or relied upon in preparing your responses to the Defendant's Second Interrogatories

Response: Plaintiff ACMI incorporates the General Objections stated above into this Response. ACMI also objects because this Request is ambiguous, overbroad, not reasonably calculated to lead to discovery of relevant evidence, and unduly burdensome. Additionally,

ACMI objects because the extremely long passage of over six years between the creation of any such documents and the four final decisions and revised final decisions (in 2006 and 2007) of the contracting officer at the GSA. This Request has made such a production even more burdensome. Subject to these objections, plaintiff will produce those non-privileged documents, if any, that it is able to locate that are responsive to this request.

Respectfully submitted,

James D. Wareham, Attorney of Record
for Plaintiff
Kirby D. Behre
Danielle W. Pierce
Paul, Hastings, Janofsky & Walker LLP
875 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: 202-551-1728
Fax: 202-551-0128

Date: June 23, 2008
LEGAL USE 79855435.1

CERTIFICATE OF SERVICE

I hereby certify that I caused to be served by email and mail this 23d day of June 2008 a copy of the foregoing Plaintiff's Responses to Defendant's Second Request for Production of Documents upon

Domenique Kirchner
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. DEPARTMENT OF JUSTICE
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530

James D. Wareham

LEGAL_US_E # 79855435.1

Arent Fox
ATTORNEYS AT LAW

**Richard J. Webber**
202.857.6254 DIRECT
202.857.6395 FAX
webber.richard@arentfox.com

June 15, 2005

Karen Poole (or Cognizant Contracting Officer)
General Services Administration - Public Buildings Service
1500 Bannister Road
Kansas City, MO 64131-3088

Re: AMEC Construction Management, Inc. (formerly Morse Diesel International, Inc.)
REQUEST FOR FINAL DECISION, Contract GS06P95GZC0501
(St. Louis Courthouse Phase II)

Dear Madam/Sir:

Pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601 et. seq., AMEC Construction Management, Inc. ("AMEC") respectfully requests the final decision of the Contracting Officer on this Claim for Payment in the amount of $22,279,529, arising out of GSA's changes to, and breaches of, Contract GS06P95GZC0501 for construction of the St. Louis Courthouse Phase II.

The factual and legal bases, and supporting documentation, for this claim are set out in the twelve volumes forwarded with this letter.

This claim covers costs – above and beyond those included in previous claims for payment now pending in the Court of Federal Claims -- that were owed to AMEC at the time of the improper default termination on June 16, 1999. As set out in the claim narrative forwarded herewith, GSA owes AMEC the amount of the unpaid contract balance, as well as costs arising out of GSA's changes and breaches – namely, productivity impact costs, delay costs, subcontractor settlements for productivity and delay costs, and costs associated with specific changes to the work. The claim narrative is supported by extensive correspondence, schedules, and other exhibits.

The required certification is attached hereto as Exhibit A. We look forward to your decision in accordance with the Contract Disputes Act.

Very truly yours,

Richard J. Webber

RJW/cah
Attachment

LDR/147912.1

**EXHIBIT A**

Certification pursuant to FAR 33.207(c) for Claim for Payment submitted under Contract GS06P95GZ0501 for construction of St. Louis Courthouse Phase II:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

David Leonard
President, AMEC Construction Management, Inc.

Date: June 14, 2005

# Letter of Transmittal

amec

TO Karen Poole
General Services Administration -
Publice Building Service
1500 Bannister Road
Kansas City, MO 64131

DATE: 15-Jun-05
JOB NO.:
ATTENTION: Karen Poole
RE: Contract GS06P95GZ0501 - Thomas Eagelton Courthouse, Phase II

WE ARE SENDING YOU [X] Attached [ ] Under separate cover via ______ the following items:

[ ] Shop Drawings [ ] Prints [ ] Plans [ ] Samples [ ] Specifications

[ ] Copy of letter [ ] Change order [X] See Below

| COPIES | DATE | NO | DESCRIPTION |
|---|---|---|---|
| 1 | 6/15/2005 | | Request for Final Decision |
| 1 | 6/14/2005 | | Certification |
| 1 | 6/14/2005 | | Claim for Payment |
| 1 each | | | Volumes I through XI - Exhibits |

THESE ARE TRANSMITTED as checked below:

[ ] For approval [ ] Approved as submitted [ ] Resubmit ____ copies for approval

[ ] For your use [ ] Approved as noted [ ] Submit ____ copies for distribution

[ ] As requested [ ] Returned for corrections [ ] Return ____ corrected copies

[ ] For review and comment [X] For Final Decision, as indicated in the letter

REMARKS

COPY TO SIGNED [signature]

AMEC Construction Management, Inc.
1633 Broadway
New York, NY 10019-6708
Tel: 212-484-0300 / Fax: 212-484-0585



*If enclosures are not as noted, kindly notify us at once.*

amec

# *CLAIM FOR PAYMENT*

**Excluding Matters before the**
**US Court of Claims**

**in connection with**

**Phase II**
**THOMAS F. EAGLETON**
**UNITED STATES COURTHOUSE**
**Contract GS06P95GZ0501**

**St. Louis, Missouri**

***Submitted by***

**AMEC Construction Management, Inc.**

**June 14, 2005**

## Table of Contents

### Executive Summary


| Section | Description | Page |
|---|---|---|
| 1.0 | Introduction | 1 |
| 2.0 | Problem Summary | 2 |
| 3.0 | Entitlement Summary | 5 |
| 4.0 | Summary of Claim Elements | 8 |
| 5.0 | Summary of Amount Requested | 9 |


### Section I – Unpaid Contract Balance


| Section | Description | Page |
|---|---|---|
| 1.1 | Introduction | 1 |
| 1.2 | Claimed Amount | 1 |
| 1.2.1 | Payment Application Summary | 1 |
| 1.2.1.1 | Unpaid Contract Balance, Payment Applications 1-40 | 1 |
| 1.2.1.2 | Payment Application 41 (May, 1999) | 1 |
| 1.2.1.3 | Payment Application 42 (June 16, 1999) | 2 |
| 1.2.2 | Claim for Unpaid Contract Balance | 2 |
| 1.2.2.1 | Unpaid Contract Balance through Payment Application 40 | 2 |
| 1.2.2.1.1 | Adjustment for Retention not Paid to Subcontractors | 2 |
| 1.2.2.1.2 | Net Amount Due | 2 |
| 1.2.2.2 | Payment Application 41 | 3 |
| 1.2.2.3 | Payment Application 42 | 4 |
| 1.2.2.4 | Liquidated Damages Assessed by GSA | 4 |
| 1.2.3 | Unpaid Contract Balance, Payment Applications | 4 |
| 1.3 | Adjustments to Approved Change Orders | 4 |
| 1.3.1 | Adjustments to Markup Rate for General Conditions | 4 |
| 1.3.1.1 | Fringe Rate on Payroll | 5 |
| 1.3.1.2 | Unallowable Costs | 6 |
| 1.3.1.2.1 | Travel & Entertainment | 6 |
| 1.3.1.2.2 | Other Unallowable Costs | 6 |
| 1.3.1.2.3 | Unallowable Cost Summary and Adjustment to Paid Change Orders | 7 |
| 1.3.2 | Adjustments to Markup for Insurance | 7 |
| 1.3.3 | Adjustment to Markup Rate on Change Orders for Payment & Performance Bonds and for the Base Contract Portion of Bond Cost | 7 |
| 1.3.3.1 | Principal and Interest Credit for the Cost of the Base Contract Bond Premium | 8 |
| 1.3.3.2 | Principal and Interest Credit for that portion of billed Change Order Cost attributable to the Bond Premium | 8 |
| 1.3.4 | Summary of Adjustments to Approved Change Orders & the Base Contract Portion of Bond Cost | 9 |
| 1.4 | Payment Requested for the Adjusted Contract Balance | 9 |

**Section II - Contract Interference**


| Section | Description | Page |
|---|---|---|
| 2.1 | Introduction | 1 |
| 2.2 | Tenant Fit-Out Changes | 5 |
| 2.2.1 | P-76 Level B4, B3, B2, Tenant Fit-Out | 8 |
| | Base Building Changes Due to Tenant Fit-Out (P-108) | 9 |
| | Other Level B4, B3, B2 Changes (Base Building and Tenant Fit-Out) | 9 |
| 2.2.2 | P-78 Level B1 Tenant Fit-Out | 12 |
| | Base Building Changes Due to Tenant Fit-Out (P108 | 16 |
| | Other B1 Changes (Base Building and Tenant Fit-Out) | 19 |
| 2.2.3 | P-82 Level 1, 1M and 2 Tenant Fit-Out | 22 |
| | Tenant Fit-Out Plumbing Design | 23 |
| | P-82 Door Revisions | 25 |
| | Design Changes Issued through RFI Responses | 31 |
| | Base Building Changes Due to Tenant Fit-Out (P-138) | 31 |
| | Other Level 1, 1M, 2 Changes (Base Building and Tenant Fit-Out) | 43 |
| | P-260 Level 1, Level 2, Level 3 Ceiling Adjustments | 47 |
| 2.2.4 | P-90 Level 3, 4, 5 Tenant Fit-Out | 50 |
| | Base Building Changes Due to Tenant Fit-Out (P-146) | 54 |
| | Other Level 3, 4, 5, Changes (Base Building and Tenant Fit-Out) | 57 |
| | P-247 TFO RFI's 2183 through 2192 | 59 |
| | P-340 TFO Level 5 Coffee Bar | 61 |
| 2.2.5 | P-98 Level 6, 9, 11, 19 Tenant Fit-Out | 64 |
| | Base Building Changes Due to Tenant Fit-Out (P-150) | 66 |
| | TFO Ceiling Door Height Conflicts | 68 |
| | Other Level 6, 9, 11, 19 Changes (Base Building and Tenant Fit-Out) | 71 |
| | P-75 Level 18 Tenant Fit-Out | 74 |
| | Base Building Changes Due to Tenant Fit-Out (P-164) | 78 |
| | Other Level 18 Changes (Base Building Tenant Fit-Out) | 79 |
| 2.2.7 | P-102 Level 20, 21, 22, Tenant Fit-Out | 82 |
| | Base Building Changes Due to Tenant Fit-Out (P-156) | 83 |
| | Other Level 20, 21 and 22 Changes (Base Building and Tenant Fit-Out) | 85 |
| | P-235 Added Electrical Panel-boards | 86 |
| | P-324 Additional TFO Electrical | 87 |
| | P-325/338 Ceiling Revisions and Door Height Conflicts | 88 |
| 2.2.8 | P-111 Level 23 and 24 Tenant Fit-Out | 91 |
| | Base Building Changes Due to Tenant Fit-Out (P-167) | 93 |
| | Other Level 23 and 24 Changes (Base Building and Tenant Fit-Out) | 93 |
| | P-216 TFO – Level 24 Revisions | 96 |
| | P-235 Electrical Revisions – Base Building | 96 |
| | P-257 RFI's # 1933R and #2121R | 97 |
| | P-287 TFO Pipe Chase – Level 23 | 97 |
| | P-310 Cut Access Flooring for TFO Partitions | 98 |
| | P-324 TFO Electrical Revisions | 99 |
| | P-325 and P-388 Door and Ceiling Conflicts | 99 |
| 2.2.9 | P-149 Level 25 and 26 Tenant Fit-Out | 102 |

| | | |
|---|---|---|
| | Base Building Changes Due to Tenant Fit-Out (P-1520 | 103 |
| | Other Level 25 and 26 Changes (Base Building and Tenant Fit-Out) | 105 |
| 2.2.10 | Tenant Fit-Out Work Summary and Conclusions | 108 |
| 2.3 | Tenant Fit-Out Scope Growth | 112 |
| | Introduction | 112 |
| | Contract Specifications- Indefinite Quantity Option | 113 |
| | Incomplete and Un-coordinated Tenant-Fit Out Packages | 114 |
| | Summary of Tenant Fit-Out Scope Growth | 122 |
| 2.3.1 | The GSA Denies MDI Additional Staff Costs | 124 |
| | GSA approves Additional Project Management Costs for Subcontractor | 126 |
| 2.3.2 | Under Funding of PDL's | 128 |
| | Under Funding of Tenant Fit-Out Work | 128 |
| | Under Funding of Base Building Changes Issued to Accommodate Tenant Fit-Out Work | 133 |
| | *P-108 Base Building Changes Due to TFO Levels B4, B3, B2, B1* | 135 |
| | *P-138 Base Building Changes Due to TFO Levels 1, 1M, 2* | 135 |
| | *P-146 Base Building Changes Due to TFO Levels 3, 4, 5* | 135 |
| | *P-150 Base Building Changes Due to TFO Levels 6, 9, 11, 19* | 136 |
| | *P-164 Base Building Changes Due to TFO Level 18* | 137 |
| | Under Funding Courtroom Changes | 137 |
| | *P-124 Special Proceedings* | 137 |
| | *P-173 Electrical Revisions to Courtrooms* | 138 |
| | P-51 Mechanical Revisions | 139 |
| | P-215 Tenant Fit-Out Millwork Changers | 141 |
| | P-235 Electrical Revisions – Base Building | 143 |
| | P-356 Duct Smoke Detectors | 145 |
| | P-430 RFI # 2704 & 2704 Electrical Revisions | 145 |
| | P-332 TFO Stand-Up Counters | 146 |
| | Summary & Conclusions – Increased Administration Efforts Due to Under Funding | 146 |
| 2.4 | Issuance of Constructive Change through the Submittal Process | 149 |
| 2.5 | Courtroom Changes | 154 |
| 2.5.1 | Special Proceedings Courtroom | 154 |
| 2.5.2 | Courtroom Technology Changes | 160 |
| | P-173 Electrical Revisions to Courtrooms | 163 |
| | P-183 Technology Changes – Bankruptcy | 165 |
| | P-190 Electrical Revisions to the Magistrates Courtrooms | 167 |
| 2.5.3 | Judge's Chamber Drawings | 168 |
| | Level 5 Plumbing Changes | 168 |
| | Millwork Delays | 170 |
| | P-190 Judge's Chamber Revisions | 171 |
| | P-155 Chamber Changes | 173 |
| 2.5.4 | Summary and Conclusions | 175 |
| 2.6 | Design & Specification Defects, Erroneous Interpretation of Specifications | 177 |
| 2.6.1 | Additions to the Structure | 177 |
| 2.6.1.1 | Introduction | 177 |
| 2.6.1.2 | Additional Steel Kickers for Architectural Precast Concrete | 179 |
| 2.6.1.2.1 | Other System Support Changes P-36, EA-33, and EA-141 | 184 |

| | | |
|---|---|---|
| 2.6.1.2.2 | Cure Notice – Number and Placement of Kickers | 190 |
| 2.6.1.2.3 | Excessive Deflection and Installation problems | 193 |
| 2.6.2 | Conclusions | 199 |


**Section III – Productivity Impact Costs**


| Section | Description | Page |
|---|---|---|
| 3.1 | Introduction | 1 |
| 3.2 | Planned Supervision | 1 |
| | Project Management | 1 |
| | Field Operations Planned Staff | 3 |
| 3.3 | Additional Supervision | 4 |
| 3.3.1 | Change Order Team | 5 |
| | Added Change Order Team Cost Summary | 14 |
| 3.3.2 | Additional Supervision in Response to Defects and Acceleration Orders | 15 |
| | Added Staffing Cost Summary | 26 |
| 3.3.3 | Additional Project Executive Supervision in Response to Design Defects and Acceleration Orders | 28 |
| | Additional Project Executive Supervision Cost Summary | 29 |
| 3.3.4 | Additional Scheduling Support | 31 |
| | Introduction | 31 |
| | Additional Scheduling Support in Response to Design Defects | 32 |
| | Additional Scheduling Support in Response to the GSA's Untimely Review of Schedules | 35 |
| | Additional Scheduling Support Costs | 36 |
| 3.3.5 | Subcontractor Premium Time | 37 |
| | Introduction | 37 |
| | Subcontractor Premium Time Costs | 40 |
| 3.4 | Payment Requested for Productivity Impact Costs | 41 |

## Section IV – Direct Costs of Constructive Changes and Breaches


| Section | Description | Page |
|---|---|---|
| 4.1 | Introduction | 1 |
| 4.2 | Floor Levelness, Floor Flatness, Core Shrinkage and Differential Settling | 1 |
| 4.2.1 | Introduction | 1 |
| 4.2.2 | Compression and Shrinkage of the Concrete Core | 2 |
| 4.2.3 | Other Project Specifications Related to Floor Levelness, Flatness | 10 |
| 4.2.4 | Conclusions | 18 |
| 4.2.5 | Cost Summary | 20 |
| 4.3 | As- Built Structural Survey | 21 |
| 4.3.1 | Introduction | 21 |
| 4.3.2 | As-Built Survey of Concrete Core | 21 |
| 4.3.3 | Embedded Plates | 33 |
| 4.3.4 | Conclusions | 35 |
| 4.3.5 | Cost Summary | 37 |
| 4.4 | Sprayed-on Fireproof Patching | 38 |
| 4.4.1 | Tenant Fit-Out and Base Building Requirements | 38 |
| 4.4.2 | Conclusions | 42 |
| 4.4.3 | Cost Summary | 42 |
| 4.5 | Layout Base Building & Tenant Fit-Out | 44 |
| 4.5.1 | Courtroom Changes | 48 |
| 4.5.2 | Layout Productivity Impacts | 49 |
| 4.5.3 | Additional Layout Costs | 59 |
| 4.6 | East Lobby Defective Design | 60 |
| 4.6.1 | Introduction | 60 |
| 4.6.2 | East Lobby Design Defects | 60 |
| 4.6.3 | Cost Summary | 74 |
| 4.7 | Interior Curtain Wall Supports | 76 |
| 4.7.1 | Interior Curtain Wall Supports Design Defects | 76 |
| 4.7.2 | Summary and Conclusions | 80 |
| 4.7.3 | Cost Summary | 81 |
| 4.8 | Constructive Changes and Breaches: Direct Cost Summary | 82 |

**Section V – Delay Costs**


| Section | Description | Page |
|---|---|---|
| 5.1 | Introduction | 1 |
| 5.2 | Entitlement Summary | 1 |
| 5.3 | Extended Field Office Overhead | 2 |
| 5.3.1 | Fringe Rate Adjustment | 3 |
| 5.3.2 | Adjustment for Unallowable Costs | 4 |
| 5.3.3 | Adjustment for Insurance | 4 |
| 5.3.4 | Extended Field Office Overhead Cost Summary | 5 |
| 5.4 | Relief from Liquidated Damages | 5 |
| 5.5 | Utility Reimbursement: June 2 through June 16, 1999 | 6 |
| 5.6 | Delay Cost Summary | 8 |


**Section VI – Subcontractor Settlements for Costs of Productivity & Delay Claims**


| Section | Description | Page |
|---|---|---|
| 6.1 | Post Termination Payments Made to Subcontractors | 1 |
| 6.2 | Apportionment of Settlement Costs to GSA | 1 |

## EXECUTIVE SUMMARY

### 1. Introduction

Morse Diesel International, Inc. ("MDI") entered into Contract GS06P95GZ0501 with the United States of America, acting by and through the General Services Administration ("GSA") on September 28, 1995, for Phase II of the construction of the Thomas F. Eagleton United States Courthouse in St. Louis, Missouri.[1] This was a large and complex project; the original contract value was $165,102,792.18, including TFO unit prices and option #9. GSA made numerous changes to the work and delayed and hindered that work throughout MDI's performance. MDI had, nevertheless, completed the great majority of the work when, on June 16, 1999, GSA terminated the contract for default, allegedly because MDI had failed to complete the work by the adjusted contract completion date. In reality, project delays for which GSA was responsible, but would not acknowledge, were the cause of the delayed completion, and the termination for default was baseless.

Prior to the default termination, MDI submitted to the contracting officer several claims for equitable adjustment arising out of changes to the work.[2] The contracting officer denied each of these claims, and they were appealed and are currently pending in the U.S. Court of Federal Claims. MDI appealed the default termination to the Court, seeking to have it converted into a termination for the convenience of the Government The claims and the effort to invalidate the default termination have been consolidated before the Court. The Government filed counterclaims in the Court proceeding, and multiple years now have been spent addressing those counterclaims. MDI's claims and its request to convert the termination for default into a termination for convenience have not yet been addressed in the Court proceeding.

Because the default termination was improper, that termination must be converted to a termination for convenience as a matter of law. AMEC is entitled to recover its termination for convenience costs. While AMEC's claim for termination for convenience costs will not be legally operative until the Court invalidates the termination for default, AMEC plans shortly to file with the Court a termination for convenience cost claim.

This submission, entitled Claim for Payment, combines all remaining claims by AMEC under the Contract for additional costs arising out of GSA's changes to, and breaches of, the Contract. The total amount claimed here is $22,279,529. Together with claims that were submitted during

---

1 Subsequent to the termination, MDI underwent a name change, becoming AMEC Construction Management, Inc. ("AMEC"). "MDI" and "AMEC" are used interchangeably throughout this claim and refer to the same corporate entity that contracted with GSA for the St. Louis Courthouse Phase II. In general, this document refers to the entity submitting these current claims as "AMEC" and it refers to the entity during performance of the courthouse work as "MDI."

2 These claims were for increased costs of contract reinstatement, eleventh floor partial termination, utility reimbursement for April 1, 1998 through October 12, 1998, wood blocking for the courtrooms, and Sachs Electric high rise differential.

contract performance (and are currently pending in the Court), the equitable adjustment owed to AMEC is a major component of AMEC's termination convenience costs.[3]

In addition to amounts AMEC is owed by GSA for changes to, and breaches of, the contract, this claim submission also seeks payment of MDI's unpaid contract balance from its regular payment applications and for improper withholdings by GSA of liquidated damages.

## 2. Problem Summary

There were three (3) main elements of GSA's interference with MDI's performance on the Thomas F. Eagleton US Courthouse:

i. The drawings and specifications were defective and incomplete, and these defects were neither timely nor accurately repaired;

ii. The process by which Tenant Fit-Out Work (TFO) was designed, directed, implemented and paid for was fractured, unduly burdensome and itself compounded the effect of the defective drawings and specifications; and

iii. GSA's and its Consultants' overall inability to properly administer the contract consistent with its expressed and implied terms caused delays, inefficiencies and increased direct costs at nearly every point of interface between the parties.

The errors and omissions within the Contract Documents required more than 2800 Requests for Information (RFI's) and 480 Change Orders (known as "Ps") to rectify – indeed, only partially rectify as of the date of Termination. The process of rectifying these errors and omissions never concluded, in that both Ps and RFI's were still being issued at the time of GSA's Termination. GSA's and its Consultants' responses to RFI's were often vague, incomplete and/or in error, causing additional delay and confusion, and resulting in additional RFI's. The Ps were themselves often incomplete or in error, and often included work that related to other Change Orders with unclear direction as to just what was to be implemented and performed. Often the changed work was not indicated in the change order documents, and identifying the full scope of the change required extensive research on the part of MDI and its Subcontractors. This research gave rise to numerous questions, and the ensuing RFI's and their responses often resulted not only in clarifications being issued to the subject Ps but also in new Ps being issued, causing further confusion over intent, scope and price, causing and exacerbating delay and inefficiency, and causing MDI and its Subcontractors to incur increased and unnecessary costs for additional staffing and related expense, and severe losses in productivity. On top of the delay, the GSA never granted any time extensions for the extra work despite valid requests by MDI, so MDI and

---

[3] AMEC also previously submitted to the contracting officer a claim for "total contract price" as an intermediary step to determining AMEC's convenience termination costs entitlement. That claim was referred to as Request for Equitable Adjustment ("REA") Part I. That document sought to establish a "total contract price" as an intermediate step to determining AMEC's convenience termination costs entitlement. Included in that "total contract price" were the amounts (as now adjusted herein) for MDI's delay costs. While REA Part I was not a claim for payment of money by GSA, it nevertheless certified to the numbers in that submission, and so interest under the Contract Disputes Act on the delay costs should run from the date of that earlier submission, August 27, 2001.

its Subcontractors were forced to compress more and more work into, effectively, less and less time.

While there were changes and constructive changes experienced in all phases of the contract, the Tenant Fit-Out Work (TFO) was particularly problematic. Design elements of the TFO Packages were spectacularly incomplete and defective, and the accompanying documents routinely specified incorrect quantities and included unit price items which were not covered by the TFO Unit Price portion of the Contract. GSA's defective TFO design greatly hindered MDI's performance, and, on top of that, the time which GSA took to rectify the design, identify/clarify the scope and fully initiate the Change Orders made matters much worse. The GSA's original plan was to release the Tenant Fit-Out work in eight (8) packages over the course of four (4) months. GSA in fact delivered the initial Tenant Fit-Out work in nine (9) packages; however, it took nine (9) months – not four – to deliver all of these initial packages. Unfortunately, these were largely useless for pricing, planning or construction. Ultimately, it took another eight (8) Ps for base building revisions necessitated by the Tenant Fit-Out work, and sixty-nine (69) other Tenant Fit-Out "Ps" over the course of seventeen (17) months to correctly depict the desired scope of work and repair the defects and omissions in the original TFO Ps. Changes to the TFO design were still being made as of the date of GSA's Termination.

GSA also caused considerable delays in obtaining adequate funding to allow it to direct the performance of the Ps. Only two TFO Changes - P-156 and P-167 - had been fully negotiated and funded as of the date of GSA's Termination. The project experienced both critical path and non-critical path delays as the result of under-funding of Ps as work that could otherwise proceed simply could not, pending commitment of funding that would allow the proper issuance of Modifications and directives. Ultimately the GSA had to resort to the issuance of interim Modifications – called "PDL's" (Price-to-be-Determined-Later) – to at least get work started. But even this process did not work efficiently. Funding specified in the PDL more often than not was woefully inadequate to cover the cost of performance, often with the result being that Change Order work could not be performed in a continuous and efficient manner And, in general, PDL's were not issued timely. PDL's issued for base building changes due to Tenant Fit-Out were typically delayed 3 to 5 months longer than TFO PDL's, and often the TFO work could not proceed until the underlying base contract work could be performed as changed.

The GSA's and its Consultants' inability to properly administer the contract affected MDI's ability to incorporate needed changes in a timely manner and destroyed MDI's momentum and productivity. In many cases it was not the Changes that caused the only significant disruption to MDI's plan; the GSA's failure to act promptly in providing directives to proceed and adequate funding was just as devastating as the problem itself. As a result, work had to be stopped, slowed, re-sequenced and/or torn out and redone. This held true for both the Tenant Fit-Out and base building work, making it impossible for MDI or its subcontractors to complete their work in accordance with plan or with any reasonable degree of efficiency. The GSA's failure to provide timely direction resulted in additional direct costs to perform the work at less than optimum times and under less than optimum conditions, and gave rise to impact costs such as out-of-sequence work, re-work, standby costs and delay costs, all of which were impacts to both MDI's and its Subcontractors' performance that need not have occurred. The process by which GSA repaired, or attempted to repair, the numerous and significant design defects was as flawed as the documents themselves. GSA's administrative processes with respect to RFI's and Change

Orders were unduly burdensome and required subjects to be revisited numerous times before they could be resolved.

The GSA steadfastly refused to acknowledge the problems created by the quality of the documents, the excessive number of Ps, the multiple RFI's and the untimely issuance of Change Order directives, and refused to grant MDI any time extensions. MDI was continually being reprimanded by the GSA for delays in responding to the Ps with complete and comprehensive cost proposals despite the fact that Ps were issued incomplete and repeated changes were being made through revisions to Ps and RFI's. GSA unilaterally withheld retainage from MDI's Payment Applications and ultimately imposed Liquidated Damages. Whether intentionally or not, these actions had a punitive effect on MDI, especially when coupled with GSA's severely inadequate funding of and payment for Change Order work. MDI elected not to flow down these withholdings to its Subcontractors, as they were already suffering due to the many GSA-caused delays and other impacts to their trade productivity, and from being unable to bill for and be paid for Change Order work because of GSA's inadequate funding.

Overall, the many changes resulted in a 74 percent increase in scope in the Tenant Fit-Out Package from the $9.9 million Allowance carried in Contract. This unanticipated growth in scope increased demands on MDI's administrative staff and impacted the schedule. Taken together, the circumstances described above, for which GSA bears contractual responsibility, imposed a significant additional administrative burden on MDI and its Subcontractors and caused them to increase their staffs significantly and incur other expense. MDI mitigated the impact by increasing its staff to plan and supervise the added work, administer the Changes, prepare and negotiate proposals, and to perform other project duties made necessary by the changes. MDI staffing levels nearly doubled over a two-year period. MDI also provided significant corporate executive support, well beyond what was ever required for the project.

GSA knew full well that the design was defective and that the failures of its Architect, and its inability to rectify the errors and omissions, were having serious adverse effects on the project. For example, in a letter dated May 14, 1998 to its Architect, HOK, the Contracting Officer acknowledged both the condition of the drawings and specifications and the impact these were having on the project and MDI, as follows:

> *"I have discussed several issues with you that continue to create problems with job progress and increase the liability of HOK on this project. Mr. Tad Tucker, of your office, had created a plan of action for addressing HOK's performance but those plans have not been executed.... I have discussed these items with you on numerous occasions since then and have been assured that my concerns are being addressed. My review of current performance is that not only are my concerns not adequately addressed but the situation is getting worse...*
>
> *"The Tenant Fit-Out process has been very difficult which has been greatly hampered by HOK's performance. The delivery schedule for the TFO work was generated by HOK's office. This schedule was not met. We did receive many of the packages when designated by HOK however these packages were not complete and the complete effort has been provided in a piecemeal fashion to*

*GSA. The initial packages did not have the electrical, security, ADA, or code compliance reviewed and incorporated. This has created the need to make many revisions to the initial drawings supplied to the contractor. HOK was required to provide the specifications and a quantity take off with the packages. These have come after the drawing submittal not with it, which created difficulty in defining the change proposals and negotiating them. ...*

*"I know that HOK has the manpower to adequately design, coordinate, and respond to construction issues. That manpower is presently lacking and is hindering the project completion..."*

Notwithstanding the failures of GSA and its Architect, GSA refused to acknowledge that MDI was not the source of the problems, and falsely sought to hold MDI accountable for a mess that was not of MDI's making..

In summary, MDI had the right to rely upon the accuracy and completeness of the drawings and specifications, including those related to Change Orders and Tenant Fit-Out. MDI had the right to rely upon GSA to fulfill its administrative obligations under the contract. When problems arose, MDI had the right to rely on GSA to cooperate in the resolution of those problems and to not interfere with its performance. Because of the conditions cited in this Claim, and found throughout the entire project record, MDI incurred a variety of additional costs for supervision and "General Conditions" as a result of the changes and delays above and beyond increased time related costs of performance. These costs are recoverable under the Contract. The loss of efficiency and other additional costs set forth in this Claim are not attributable to any one specific element of extra work or an individual delay related to that extra work but rather represent the aggregate effect of the changed conditions set forth throughout this Claim. Inasmuch as these changes were in no way the fault of MDI, without question, MDI is entitled to receive compensation for the general loss of efficiency resulting from those GSA changes.

### 3. Entitlement Summary

Throughout the course of the Courthouse project, MDI encountered defects in the design plans and specifications provided by GSA, misinterpretation by GSA with respect to the specification requirements, and failure on the part of GSA and its Architect to cooperate and not hinder MDI's performance. GSA's actions and failures to act not only caused constructive changes to the contract, but also constituted a breach of contract. The constructive changes and GSA's breach resulted in significant schedule delays and extra costs for which MDI is entitled to an equitable adjustment. This claim shows the various impacts MDI suffered to its planned performance due to these causes and for which recovery is warranted.

GSA, by providing MDI with the design plans and specifications to construct the Courthouse project, warranted the adequacy and accuracy of those plans and specifications. It is well settled that the Government warrants the sufficiency of its design specifications. *United States v.*

*Spearin*, 248 U.S. 132, 137 (1918). Indeed, "[w]hen the Government provides a contractor with design specifications, such that the contractor is bound by contract to build according to the specifications, the contract carries an implied warranty that the specifications are free from design defects." *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084 (Fed. Cir. 2002).

Under the implied warranty of specifications, GSA was responsible for the correctness, adequacy and feasibility of the plans and specifications it furnished to MDI. *Spearin*, 248 U.S. at 137 (insertion into contract of specifications prescribing character, dimensions and location of sewer imported warranty that sewer would be adequate if contractor complied therewith); *Ordnance Research, Inc. v. United States*, 221 Ct. Cl. 641, 670, 609 F.2d 462, 479 (1979) ("[w]hen the government issues design specifications of a detailed nature . . . it warrants the sufficiency and efficacy of those specifications to produce the desired product in a satisfactory manner"); *Concrete Placing Co. v. United States*, 25 Cl. Ct. 369, 375 (1992) ("In exchange for the right to direct specifically how a project shall be performed, the government warrants that its directions are not defective"),aff'd 985 F.2d 585 (Fed. Cir. 1992).[4] GSA breached the implied warranty of the specifications it furnished to MDI by providing specifications that were defective.

The defects in GSA's specifications, which were not apparent at the time of bid but surfaced only during contract performance, created significant schedule and cost impacts to MDI. MDI is not responsible for the consequences of any defects in those plans and specifications and is entitled to an equitable adjustment for the additional expense it incurred as a result of such defects. *Baltimore Contractors, Inc. v. United States*, 12 Cl. Ct. 328, 341 (1987); see *Ordnance Research*, 221 Ct. Cl. at 670, 609 F.2d at 479 (if Government specifications are defective, the Government "must compensate the contractor for the additional cost of performance").

Where, as here, the Government provides defective specifications—and therefore breaches the implied warranty that satisfactory contract performance will result from adherence to the specifications—the contractor may recover "*all* of the costs proximately flowing from the breach." *Essex Electro Engr's, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000) (emphasis added). MDI is not limited to an equitable adjustment for changes ordered to correct mistakes due to GSA's defective specifications. Rather, the Government, "in instances when a change is necessitated by defective specifications, must pay 'the entire resulting damage without any

[4] Other cases finding that a contractor was entitled to equitable adjustment due to a breach of the Government's implied warranty of specifications include, for example: *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1343 (Fed. Cir. 2004) (contractor could recover an equitable adjustment where it relied on defective Government specification and defect was not patent); *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1324 (Fed. Cir. 2004) (contractor entitled to recover additional costs incurred where contractor's reading and reliance on Government specifications and drawings was reasonable, and Government's additional requirement was material change); *Essex Electro Engr's, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (the Government breaches its obligation to carry out its contractual duties within a reasonable time when it delays correcting defective plans); *M.A. Mortenson Co. v. United States*, 40 Fed. Cl. 389, 431 (1998) (contractor entitled to reimbursement for costs incurred in reliance on defective Government specifications and in repairing and investigating functional failures caused thereby); *cf. Mortenson*, 40 Fed. Cl. at 420 (change in specifications made during performance was indicative of defective specifications); *Big Chief Drilling Co. v. United States*, 26 Cl. Ct. 1276, 1296 (1992) (successful drilling that occurred after agency allowed specification to be amended supported finding that original specification was defective).

deduction for time to make changes.'" *Big Chief Drilling Co. v. United States*, 26 Cl. Ct. 1276, 1304 (1992) (quoting *Laburnum Constr. Corp. v. United States*, 163 Ct. Cl. 339, 350, 325 F.2d 451, 457-58 (1963)).

Compensable costs include those costs attributable to any period of delay that results from the defective specifications—"'all delay due to defective or erroneous Government specifications are *per se* unreasonable and hence compensable.'" *Essex,* 224 F.3d. at 1289 (quoting *Chaney & James Constr. Co. v. United States*, 190 Ct. Cl. 699, 707, 421 F.2d. 728, 732 (1970)). Moreover, recoverable damages extend to any costs incurred due to any MDI idleness that was the result of the defective specifications. The Government "cannot, by errors in the specifications, cause delay in [the contractor's] completion of the work and then compensate [the contractor] merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors." *Big Chief*, 26 Cl. Ct. at 1304. MDI is entitled to an equitable adjustment for all costs that it incurred as a result of GSA's breach of its implied warranty of specifications and the constructive changes made to the contract due to corrections that were required in order to remedy those defects, and to counter the effects of GSA's misinterpretation of its specifications, during the course of contract performance.

In addition to the implied warranty of specifications where the Government furnishes design specifications to the contractor, every contract with the Government contains an implied obligation that neither party will do anything to prevent performance by the other party, or to hinder or delay such performance. *George A. Fuller Co. v. United States*, 108 Ct. Cl. 70, 94, 69 F. Supp. 409, 411 (1947). The implied duties to cooperate and not to hinder performance are separate but related duties:

> When the government actively interferes with the contractor, and that interference is not justified, then the government has breached its implied duty not to hinder or interfere with the contractor's performance. When some government action is essential for the contractor to perform and the government wrongfully fails or refuses to take that action, then the government has breached its implied duties to cooperate and not to hinder are present in all government contracts, they qualify any right to suspend that the government has in [the] contract.

*Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002) (internal citations omitted).

Throughout the course of the contract, GSA breached its implied duty to cooperate and not hinder MDI's performance, by both its actions and inactions. Through its obstructive activities, GSA failed in its duty to "do whatever is necessary to enable the contractor to perform." *Lewis-Nicholson, Inc. v. United States*, 213 Ct. Cl. 192, 204, 550 F.2d 26, 32 (1977) (the Government breached its obligation not to prevent, interfere with, or unreasonably delay performance through inadequate planning and other delays). The delays caused by GSA, as well as the subsequent improper suspension and termination of MDI's contract, also were a breach of the Government's duty not to hinder the contract. *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 59 (2001) (the Government cannot suspend a contract if, or to the degree that, the suspension is due to a breach of the implied duty to cooperate and not to hinder the contract). Likewise, the Government may be held liable for a breach of the implied duty not to hinder performance if the hindrance is caused by the fault of the Government. *Id.* at 70-72 (the agency breached its

implied duty not to hinder performance where certain contract suspensions were wrongfully caused by the agency, their length was unreasonable, and the contractor's operations were significantly hindered thereby).

Lack of diligence and interference with or failure to cooperate in the other party's performance also violate the obligation of good faith, as do "'[s]ubterfuges and evasions.'" *Emily Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988) (quoting Restatement (Second) of Contracts § 205 comment d (1981) (contracting officer's evasive conduct misled contractor and consequent interferences in performance rose to level of material breach of contract), *modified on other grounds*, 857 F.2d. 787 (Fed. Cir. 1988). GSA's improper actions and inactions also violated this obligation owed to MDI.

The implied duties of good faith, fair dealing and cooperation also can be breached by the Government's failure to negotiate and make payment. *Abcon Assocs., Inc. v. United States*, 49 Fed. Cl. 678, 687-88 (2001), *aff'd*, 2002 WL 31796191 (Fed. Cir. 2002) (agency's improper assessment of liquidated damages had a significant adverse impact on contractor during critical period of performance and constituted breach of Government's implied duty to cooperate).[5] GSA's refusal to negotiate with and make payment to MDI with regard to work performed by MDI thus also represents a breach by GSA.

Where the Government requires a constructive change in a contract, it "must fairly compensate the contractor for the cost of the change." *Aydin Corp. v. Windnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995), citing *J.B. Williams Co. v. United States*, 450 F.2d 1379, 1394, 196 Ct. Cl. 491 (1971). In addition to defective specifications and contract interference, the Changes clause covers disputes over contract interpretation and acceleration. See Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 678 (1994). As happened here, a constructive change occurs when the Government orders the contractor to perform work that is not specified in the contract documents. *CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 203 (2003). The contractor is then entitled to an equitable adjustment. See *Chris Berg, Inc. v. United States*, 455 F.2d. 1037, 1050 (Ct. Cl. 1972).

GSA's withholding of the contact balance also constitutes a breach of contract. FAR 52.232-5 obligates GSA to pay the contract price and to make progress payments for work performed. GSA has inexcusably failed to do so here.

**4. Summary of Claim Elements**

This claim is organized into six sections. A brief overview of each section is set out below.

Section I, entitled "Unpaid Contract Balance," requests payment for the unpaid contract balance arising from GSA's failure to pay all amounts invoiced in MDI's payment applications for work

---

[5] Breaches of these implied duties also have been found in other contexts. *See, e.g., CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 201 (2003) (agency breached its implied duty to cooperate when it used improper methods of inspection and changed the grades of a project, which resulted in increased work for the contractor); *Sipco Servs. Marine Inc. v. United States*, 41 Fed. Cl. 196, 217-18 (1998) (breach of duty to cooperate and delay brought about by excessive Government supervision and imposition of testing procedures beyond those contemplated in contract).

in place. This section also incorporates certain adjustments to previous GSA payments for change order work for costs relating to general conditions and bond.

Section II, entitled "Contract Interference," describes GSA's changes to, and breaches of, MDI's contract, particularly in the area of tenant fit-out work. GSA's actions delayed both the critical and non-critical path work and impacted the productivity of MDI's subcontractors, as well as the productivity of MDI's management team.

Section III, entitled "Productivity Impact Costs," sets out MDI's additional contract administration costs that resulted from GSA's changes to, and breaches of, the contract. These costs were for added management and supervisory personnel, executive support and overtime premium costs.

Section IV, entitled "Direct Costs of Constructive Changes and Breaches," identifies particular changes or breaches and the additional costs attributable to each. These claims are for East Lobby defective design, interior curtain wall supports, additional layout of base building and tenant fit-out work, sprayed on fireproof patching, floor levelness and flatness, and GSA's failure to provide an as-built structural survey.

Section V, entitled "Delay Costs," seeks payment for MDI's time-related additional costs of performance, primarily for extended field office overhead. These were MDI's additional costs attributable to GSA's 365-day uncompensated delay of the work. This section also seeks return of the liquidated damages that were improperly withheld from progress payments and reimbursement of MDI's utility costs for the period June 2, 1999 through June 16, 1999.

Section IV, entitled "Subcontractor Settlements for Productivity and Delay Claims," seeks reimbursement of AMEC's payments to subcontractors Sachs Electric and ICS/NCS Joint Venture for the costs they incurred due to delay and loss of productivity because of GSA's changes and interference with the work.

**5. Summary of Amount Requested**

The total amount claimed herein is $22,279,529 broken down by section as follows:

| Section | Description | Amount |
|---|---|---|
| I | Adjusted unpaid contract balance | $ 4,972,044 |
| III | Productivity impact costs | $ 800,755 |
| IV | Direct costs of constructive changes & breaches | $ 1,418,354 |
| V | Delay costs | $ 7,420,776 |
| VI | Subcontractor settlements for productivity & delay claims | $ 7,667,600 |
| | TOTAL | $22,279,529 |

Paul Hastings
ATTORNEYS

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Frankfurt
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Tokyo
Washington, DC

(202) 551-1719
kirbybehre@paulhastings.com

July 18, 2008 37903.00006

**VIA E-MAIL AND U.S. MAIL**

Domenique Kirchner, Esq.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W.; 8th Floor
Washington, D.C. 20530

Re: AMEC Construction Management, Inc.,
f/k/a *Morse Diesel International, Inc. v. United States*, Case No. 06-867

Dear Domenique:

Attached please find an index of the boxes of documents that we will be providing for your inspection on Friday, July 25, 2008. Pursuant to your request for prioritizing Mr. Laskowske and Mr. Harwood's documents, we are providing those to you first. Please be aware that we continue to review the documents in these boxes, and to the extent that entire boxes identified on the attached index contain only privileged documents, such boxes will of course not be made available.

We are providing this index as a courtesy. We are not waiving and do not intend to waive any privileges or work product protections by providing this index. Additionally, this index cannot be used as affirmative evidence in the case or attached to any pleadings, as this index was generated by counsel.

Sincerely,

Kirby D. Behre

Kirby D. Behre
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

LEGAL_US_E # 80238698.1

Confidential

| Amec: Index | |
|---|---|
| Box Number | Contents |
| 076 | Paul Lakowske Files |
| 079 | Paul Lakowske Files |
| 080 | Paul Lakowske Files |
| 081 | Paul Lakowske Files |
| 082 A | Paul Lakowske Files |
| 083 A | Paul Lakowske Files |
| 083 B | Paul Lakowske Files |
| 084 A | Paul Lakowske Files |
| 084 B | Paul Lakowske Files |
| 085 A | Paul Lakowske Files |
| 085 B | Paul Laskowske Files |
| 086 | Paul Lakowske Files |
| 087 | Paul Lakowske Files |
| 115 | Paul Lakowske Files |
| 116 | Paul Lakowske Files Chrono 1996 |
| 117 | Paul Lakowske Files Chrono Misc |
| 118 A | Paul Lakowske Files McCormack Place |
| 118 B | Paul Lakowske Files McCormack Place |
| 119 | Paul Lakowske Files Fire-Safe #1 |
| 120 | Paul Lakowske Files Fire-Safe #2 |
| 121 | Paul Lakowske Files |
| 122 | Paul Lakowske Chrono Files, Notes and Photos |
| 123 | Paul Lakowske Chrono Files, 1997 |
| 124 | Paul Lakowske Chrono McCormack Place |
| 125 | Paul Lakowske Chrono Files, 1998 |
| 150 | P. Laskowske Files |
| 151 | P. Laskowske Files |
| 152 | P. Laskowske Files |
| 250 A | Paul Laskowske's Files (From Lateral File Cabinet |
| 250 B | Paul Laskowske's Files (From Lateral File Cabinet |
| 251 A | Paul Laskowske's Files (From Lateral File Cabinet |
| 251 B | Paul Laskowske's Files (From Lateral File Cabinet |
| 252 A | Paul Laskowske's Files (From Lateral File Cabinet |
| 252 B | Paul Laskowske's Files (From Lateral File Cabinet |
| 253 | Paul Laskowske's Files (From Lateral File Cabinet |
| 465 | Paul Lakowske Mtg. Minutes |
| 482 | Paul Lakowske's Office (Misc. Files Off Desk) |
| 483 A | Paul Lakowske's Binders |
| 483 B | Paul Lakowske's Binders |
| 484 | Paul Lakowske's Office- Files |
| 485 | Paul Lakowske's Office- Files |
| 486 | Paul Lakowske's Office- Files |
| 487 | Paul Lakowske's Office- Files |
| 488 | Paul Lakowske's Office |
| 489 | Paul Lakowske's Office- Files |
| 537 | Graham Harwood Misc. Docs |
| 538 | Paul Lakowske Misc. |
| 651 | Graham Harwood Office: Upper Shelves |
| 652 | Graham Harwood Office: Upper Shelves |
| 653 | Graham Harwood Office: Upper Shelves |

Confidential

| | |
|---|---|
| 654 | Graham Harwood Office: Upper Shelves |
| 655 | Graham Harwood Office: Upper Shelves |
| 656 | Graham Harwood Office: Upper Shelves |
| 657 | Graham Harwood Office: Lower Shelves |
| 658 | Graham Harwood Office: Lower Shelves |
| 659 A | Graham Harwood Office |
| 659 B | Graham Harwood Office |
| 664 | Graham Harwood Office |
| 665 | Graham Harwood Office |
| 666 | Graham Harwood Office |
| 667 | Graham Harwood Office |
| 668 | Graham Harwood Office |
| 669 | Graham Harwood Office |
| 671 A | Graham Harwood Office |
| 671 B | Graham Harwood Office |
| 672 | Graham Harwood Office |
| 673 | Graham Harwood Office |
| 674 | Graham Harwood Office |
| 978 A | Graham Harwood Issues (Box 1 of 3) |
| 978 B | Graham Harwood Issues (Box 1 of 3) |
| 979 | Graham Harwood Issues (Box 2 of 3) |
| 980 | Graham Harwood Issues (Box 3 of 3) |
| 981 A | Graham Harwood Issues |
| 981 B | Graham Harwood Issues |

U. S. Department of Justice

Civil Division

Tele: (202) 307-1111
Fax: (202) 514-8624

JED:DKirchner
154-06-867

*Washington, D.C. 20530*

July 24, 2008

Danielle Pierce
Paul, Hastings, Janofsky & Walker LLP
875 15th Street N.W.
Washington, D.C. 20005
Tele: (202) 551-1779
Fax: (202) 551-0119
By email and regular mail

Re: AMEC Construction Management, Inc. v. United States, Fed. Cl. No. 06-867C

Dear Ms. Pierce:

Regarding your email dated July 23, 2008 (copy attached), the Government requires access to plaintiffs' complete payment application files, including the complete files relating to payment applications numbers 40 and 41. The two documents that you have identified that were included in plaintiff's June 14, 2005 claim submitted to the GSA are not the complete payment applications files of plaintiff regarding those two payment applications. Please let me know whether the plaintiff is producing its complete payment application files for our review.

Very truly yours,

Domenique Kirchner
Senior Trial Counsel
Commercial Litigation Branch

**Kirchner, Domenique (CIV)**

**From:** Pierce, Danielle W. [daniellepierce@paulhastings.com]
**Sent:** Wednesday, July 23, 2008 4:49 PM
**To:** Kirchner, Domenique (CIV)
**Cc:** Behre, Kirby D.
**Subject:** ACMI - 06-867

Domenique,

ACMI attached copies of Pay Applications #40 and #41 to the Claim for Payment that it submitted to the Government on June 14, 2005. Additionally, we provided you with copies of those Pay Applications in our June 20, 2008 production; they were bates labeled ACMR0000005-ACMR0000056.

Danielle

*********************************************************
IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.
*********************************************************

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

For additional information, please visit our website at www.paulhastings.com.