# EXHIBIT 25

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

AMEC CONSTRUCTION MANAGEMENT, INC.,
f/k/a Morse Diesel International, Inc.,

Plaintiff,

-against- Case No. 06-867
(Judge Braden)

THE UNITED STATES,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

June 25, 2008
8:50 a.m.

Videotaped deposition of MARTIN HOM, taken by attorneys for Plaintiff, pursuant to subpoena, held at the offices of Paul, Hastings, Janofsky & Walker, LLP, 3579 Valley Centre Drive, San Diego, California, before Helen Mitchell, a Shorthand Reporter and Notary Public.

WINTER REPORTING, INC. 212.953.1414

(Hom - 6/25/08)

to?

A That the PTIs represented issues after termination that Jacobs determined that Morse Diesel was responsible for as excess reprocurement costs.

Q And so your initial understanding was that it was only the defects, and later you came to understand that you should have included everything that Jacobs --

A That's not --

Q -- was looking at?

A -- what I said.

Q Okay, please explain, because I don't understand.

A I said my subsequent understanding of the PTIs was that Jacobs determined that they were excess reprocurement costs in Phase III that Morse Diesel was responsible for.

Q How much double counting did that result in?

A I don't know.

Q I guess I'm still unclear as to what the misunderstanding was, so maybe you could restate it for me.

(Hom - 6/25/08)

A I think I've said it. Prior to April 2007, I believed the PTIs represented defective work installed by Morse Diesel and its subcontractors during Phase II. In April 2007, I understood them to represent Jacobs -- Jacobs determined them to be excess reprocurement costs in Phase III that Morse Diesel was responsible for.

Q What did you do as a result of learning that new information?

A I had a meeting with Jacobs.

Q What was the purpose of the meeting?

A To refine the issues.

Q Was another calculation done?

A I did not do another calculation.

Q Were you engaged in discussions with anybody about how a new number could be come up with?

A I think that meeting involved Miss Kirchner, and the subject of attorney/client privilege.

MS. KIRCHNER: Okay. If that's where we're going --

(Hom - 6/25/08)

THE WITNESS: Yes.

MS. KIRCHNER: Okay. He was at a meeting with me where we are asserting attorney/client privilege, and as to that meeting with me, I'm instructing him not to answer as to the meeting with me, if I understand where he's going.

(Letter marked Hom Exhibit 2 for identification.)

Q I'm showing you what's been marked as Hom Exhibit No. 2.

Could you take a look at that exhibit and see if you can identify it.

(Pause)

A Your question?

Q Just do you recognize the exhibit?

A I've never seen this document in this form.

Q Have you seen this document in another form?

A Yes, I believe.

Q What form would that be?

A I drafted a letter similar to this in January of 2006. I'm not quite sure if it's

(Hom - 6/25/08)

exactly the same, I have not done a word-to-word comparison.

Q Directing your attention to the -- the pages don't seem to be numbered, but the third page of the exhibit, which is the third page of the letter, which contains a total amount of approximately $30 million.

Do you see that?

A I see it.

Q Was that number the result of the work that you engaged in?

THE WITNESS: Read that back for me.

(Record read)

MS. KIRCHNER: Please read back further so he can knows exactly what number.

(Record read)

A It appears to be. Without looking at the work that I did in January 2006, I can't be exactly sure whether the number is the same or not.

Q And when you say the work you engaged in, what are you referring to

(Hom - 6/25/08)

A Your question, I'm sorry?

Q Exhibit No. 12, the August 9, 2007 final decision, does not use the same method of calculation, it appears, that you used; is that correct?

A I would agree with you, yes.

Q Did you have any information as to why the methodology for calculating changed?

A State your question again, I'm sorry.

Q Do you know why the government abandoned the methodology you utilized to come up with the $30 million, and used a new methodology to come up with a final demand of 17 million?

A No.

MS. KIRCHNER: Objection.

Q Directing your attention back to Exhibit 5, that's the compendium of legal bills.

A Okay, I have that exhibit.

Q Looking at the page AALRR10227. It's an invoice --

A Hang on a second.

Q It's an invoice for April of '07.

(Hom - 6/25/08)

A I have it.

Q Those entries are for dates of April 16, '07 through April 21st of '07, and they total approximately 26-1/2 hours that was spent looking at the excess cost of reprocurement issue; correct?

A Correct.

Q And this is more than a year after the final decision that you authored was issued; correct?

A I didn't issue a decision. I drafted for the contracting officer one in January, but if that's the gist of your question, yes.

Q And it was approximately four months prior to the issuance of Hom Exhibit No. 12? That's the August 9, 2007 final decision reducing the amount sought to 17 million; correct?

A I've never seen Exhibit 12, but if the dates are correct, I would agree with your math.

Q Do you recall what was discussed during your meetings in April of '07?

(Hom - 6/25/08)

A I think the Department of Justice has claimed attorney/client privilege for that meeting.

Q I'm sure their able counsel will --

MS. KIRCHNER: He asked you do you remember. Can you answer yes or no --

THE WITNESS: Yes.

MS. KIRCHNER: -- whether you remember.

A Yes.

Q And during the course of those meetings was the modification of the final decision discussed?

MS. KIRCHNER: I'm going to instruct him not to answer questions as to the meetings and discussions that he had with me and Catherine Crow.

Q Does looking at these time entries from April of '07 refresh your recollection as to whether or not you were aware of what the new final decision amount would be?

MS. KIRCHNER: Objection, ambiguous.

(Hom - 6/25/08)

A Can you restate your question?

Q Does looking at these time entries for April of '07 refresh your recollection as to whether or not you were aware back in April of '07 that the final decision amount was going to be lowered significantly, to $17 million?

THE WITNESS: Can you read that for me, please? I'm sorry.

(Record read)

A No.

MS. KIRCHNER: Object --

Q Directing your attention to that same exhibit, the compendium of the bills, Exhibit 5, page 10230 and 10231.

A I see them.

Q Looking at your time entry for May 15th, the first of two, you indicate that you had a telephone conversation with Miss Kirchner regarding the revision to the excess reprocurement final decision; is that correct?

A Yes.

Q Were you aware in April of '07 that the government intended to issue yet another revision to its final decision?

(Hom - 6/25/08)

MS. KIRCHNER: You can answer, but you're not to refer to any conversations you had with me.

So if you can answer without referring to conversations that you had with me.

A I don't believe a revision to the final decision had been issued at that point in time.

Q Were you aware that one was being considered?

MS. KIRCHNER: Again, you can answer, as long as you're not referring to conversations you had with me or with Catherine Crow.

A I can't answer the question based on the claim of privilege, sorry.

Q Looking at the entry prior to that, for April 14th, 2007, there's an entry for a "Telephone C. Crow and D. Phillips re meeting to discuss calculation of excess reprocurement costs."

Do you see that entry?

A I see that entry.

(Hom - 6/25/08)

Q Does that refresh your recollection whether prior to today you were aware that the GSA had revised its demand down to $17 million?

THE WITNESS: Can you read the question for me again, please.

(Record read)

A No.

Q Looking at page 1231 -- I'm sorry, 10231, the next page --

A I have it.

Q -- it indicates that during the month of May of '07 you billed the federal government for 41 hours worth of your work; correct?

A Correct, including travel time, I believe.

Q And that work was all associated with working on the excess cost of reprocurement and the final decision revision; correct?

A No.

Q What entries don't relate to those two topics?

A I did nothing to revise the final

(Hom - 6/25/08)

costs at any time?

A I believe Brent was identifying issues and backup documents, and I was there to assist him, to ensure adequate documentation was copied out of the files.

(E-mail marked Hom Exhibit 16 for identification.)

Q I'm showing you next what's been marked as Hom Exhibit No. 16.

Could you look at that exhibit, please, and see if you can identify it.

(Pause)

A Yes, I've seen this document before.

Q When was the last time you saw this exhibit?

A Probably in May of this year.

Q And for what purpose were you reviewing it in May of this year?

A In response to your subpoena.

Q Does this e-mail relate to the meetings that you testified previously occurred in April of '07, which were reflected in your time entries for April 17th, 18th and 19th

(Hom - 6/25/08)

of 2007?

MS. KIRCHNER: Objection, ambiguous.

A I think the Department of Justice has exercised its right for attorney/client privilege for that meeting.

Q You have able counsel with you to address that if she's going to invoke that.

MS. KIRCHNER: I think you -- why don't you read the question back for him.

(Record read)

MS. KIRCHNER: Objection, ambiguous, compound.

THE WITNESS: Do you want me to answer?

A Yes.

Q And do you recall attending those meetings?

A Yes.

Q What was discussed during those meetings?

MS. KIRCHNER: I'm going to instruct him not to answer as to the

(Hom - 6/25/08)

meeting with -- that he attended that I'm present and Catherine Crow was also present.

MR. BEHRE: Well, unfortunately, that's been waived tenfold.

MS. KIRCHNER: It's not been waived.

MR. BEHRE: You're producing all these privileged documents. I've called your attention to it and I've asked you whether it's inadvertent production. You have not asserted that, you've waived.

MS. KIRCHNER: I have not waived, and I'm instructing him not to answer as to what was discussed at the meeting where I was present and Catherine Crow was present.

MR. BEHRE: You produced agendas, you produced billing records, you produced this document. I guess we'll have it out before the judge, but --

MS. KIRCHNER: You can do whatever you --

(Hom - 6/25/08)

MR. BEHRE: -- it's an incredible waiver in my mind, and I've --

MS. KIRCHNER: It's no waiver.

MR. BEHRE: -- asked you multiple times whether you wanted to take it back. You didn't.

MS. KIRCHNER: There is no waiver as to the meeting he attended and his conversations -- at conversations in the meeting where I'm present and Catherine Crow is present.

Q Mr. Hom, were you retained pursuant to a privilege that you understood existed at the time of your retention by the government?

A Say again.

Q Were you retained pursuant to a privilege?

A I don't quite understand your question.

Q Was your retention by the GSA pursuant to a privilege, or were you retained as any expert would be in an unprivileged situation?

(Hom - 6/25/08)

MS. KIRCHNER: Objection, ambiguous.

A I view my retention as an attorney, an outside attorney.

Q And was everything you did, in your mind, privileged?

A Yes, except for the excess reprocurement costs, they've allowed this to go forward.

Q Explain that.

MS. KIRCHNER: Objection, asked and answered.

Q The last part of it, except the --

MS. KIRCHNER: Objection, asked and answered.

A The testimony on excess reprocurement costs.

Q But everything other than your testimony here today you would consider to have been privileged?

A Yes.

Q And so all of the e-mails that we've been showing you, that you were on, it would be your position that those were

(Hom - 6/25/08)

privileged?

A Because they relate to the excess reprocurement costs, they've allowed that to go forward.

Q And you have been sitting here while I've been showing you those and counsel has made no effort to invoke privilege or claim inadvertent production; correct.

A As far as I'm concerned, the stuff on excess reprocurement costs, they've allowed to go forward.

(E-mail from Georgann Butler dated April 20, 2007 marked Hom Exhibit 17 for identification.)

Q I'm showing you what's been marked as Hom Exhibit No. 17.

Could you look at that exhibit and see if you can identify it.

A It appears to be an e-mail from Georgann Butler to many people, I note that I'm in the "to" line, April 20th, 2007.

Q Did you receive this e-mail?

A I believe so. I don't have any reason to believe that I did not receive it.

(Hom - 6/25/08)

Q Was this e-mail and its attachment part of the materials that you've produced in this case to government counsel?

A I believe so, yes.

MR. BEHRE: Domenique, I'd ask for production of this from his files.

MS. KIRCHNER: We asserted that it's privileged, and you know this.

MR. BEHRE: You've produced it out of the GSA's own files.

MS. KIRCHNER: I never produced the meeting notes.

MR. BEHRE: I'm talking about the e-mail.

MS. KIRCHNER: That's what I'm just telling you, the attachment is privileged, and we have claimed privilege for it, and it's never been produced.

MR. BEHRE: I'm asking about the e-mail. What I'm -- the witness has just indicated that he produced it to you.

MS. KIRCHNER: Correct.

(Hom - 6/25/08)

MR. BEHRE: You have not produced it to us.

MS. KIRCHNER: That's correct. That's correct.

MR. BEHRE: It's not on your privilege log.

MS. KIRCHNER: Yes, it is.

MR. BEHRE: The attachment is, but not the e-mail.

MS. KIRCHNER: You look at the response to the request for production of documents.

MR. BEHRE: So his version of this e-mail is privileged, GSA's version is not?

MS. KIRCHNER: The attachment is privileged.

MR. BEHRE: I'm just asking you about the e-mail. I'm asking you to produce that which the witness has said he produced.

MS. KIRCHNER: So you just want the front page?

MR. BEHRE: The e-mail, yes.

(Hom - 6/25/08)

MS. KIRCHNER: Without the attachment, that's what you're asking for? You want the front page without the attachment.

MR. BEHRE: Well, we're going to obviously litigate with the court whether or not we're entitled to the attachment. It's my argument that there's been a subject matter waiver regarding that meeting, given the myriad of documents you produced about the meeting.

MS. KIRCHNER: I disagree with you on that, but if I understand you, you're asking for -- I don't have that with me, so when I get back I'll have to, you know, go through the files, but it's my understanding it would be duplicative, the first page would be duplicative, and then there would be the attachment, and we have claimed privilege, and specifically for the attachment. So if the -- I'll go back and look at our files, but we've got -- it should be

(Hom - 6/25/08)

duplicative of this (indicating).

Q Mr. Hom, do you recall receiving this e-mail?

A I think I testified that I don't have any reason to believe I did not receive it.

Q Do you recall reviewing the notes that were attached to that e-mail?

A Specifically, no.

Q Do you recall whether you or anybody else in receipt of this e-mail let Georgann Butler know if they found any errors in her notes?

A I did not provide any, and I did not see any.

Q Did you personally take any notes during the course of those three or four days of meetings?

A No.

Q You said that rather quickly. How can you be so sure?

A Because I looked through my file for you last month, and again yesterday, to make sure I captured everything.

Q You sat through three or four days

(Hom - 6/25/08)

worth of meetings and you didn't take any notes?

A Correct.

Q Is that your normal practice, not to take notes at meetings?

A It depends on what the subject matter is.

Q And what was the subject matter here that necessitated you not taking notes?

MS. KIRCHNER: He's not to answer as to subject matter of the meeting where I'm present and Catherine Crow is present.

MR. BEHRE: Well, we've seen all these e-mails about what the subject matter is, so...

MS. KIRCHNER: He's not to answer as to what was discussed at that meeting, period. I'm referring to the meeting --

MR. BEHRE: So without getting into the --

MS. KIRCHNER: -- with the Department of Justice counsel, and Catherine Crow was also present there

with me.

MR. BEHRE: And I would note that the e-mails that you have objected to all have the two of you on them.

Q Without getting into the substance of what was discussed at the meeting, was there something about the substance of that meeting that made you not take notes?

A Sometimes my practice is if I know others are taking notes, that I won't take notes.

Q Was one person at this meeting designated to be the scribe or the note taker?

A No.

Q Did you expect that somebody else was filling that role?

A Yes.

Q Looking at the list of recipients of this e-mail, Roger Haddock was employed by Jacobs; correct?

A Correct.

Q Was it your understanding that there was a privileged relationship between the government and Jacobs?

(Hom - 6/25/08)

MS. KIRCHNER: Objection, calls for a legal conclusion.

MR. BEHRE: Well, fortunately, he's a lawyer who was working for the government during this time period.

MS. KIRCHNER: Objection, calls for a legal conclusion.

A No.

Q Brent.Daubach@royals.com, did he have a privileged relationship with the government?

MS. KIRCHNER: Objection, calls for a legal conclusion.

A None that I'm aware of.

Q Who is r2herron, if you know?

A Bob Herron.

Q And where was he employed at the time of this e-mail?

A I do not know.

Q Was he at one point a government employee?

A Yes.

Q And did he leave government?

A That's my understanding.