# EXHIBIT 42

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

AMEC CONSTRUCTION MANAGEMENT, INC.,
f/k/a Morse Diesel International, Inc.,

Plaintiff,

-against- Case No. 06-867

(Judge Braden)

THE UNITED STATES,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

July 23, 2008
8:34 a.m.

Videotaped deposition of LINDA PHILLIPS, taken by attorneys for Plaintiff, pursuant to subpoena, held at the offices of Sonnenschein Nath & Rosenthal LLP, 4520 Main Street, Kansas City, Missouri, before Helen Mitchell, a Shorthand Reporter and Notary Public.

(Phillips - 7/23/08)

with doing that without understanding the full implications of the cash flow. And I'm not -- I don't know why she was uncomfortable.

Q Well, do you have any reason to believe that there was some use of different pots of money in order to avoid or facilitate avoiding the Anti-Deficiency Act?

A No.

Q Ed Simon makes a statement in the first paragraph that "Even on time and material contracts, all contract funding should be obligated in advance of any T&M work to be performed."

Do you see that language?

A Yes.

Q Was, in fact, anything done to ensure that work on a T&M -- or the funding on T&M contracts was obtained before work was commenced?

A It was. To me, this was a reminder. It was to remember, you know -- it doesn't say it was being done, it just is a reminder.

(Phillips - 7/23/08)

(E-mail from Ed Simon marked Phillips Exhibit 23 for identification.)

Q Showing you next what's been marked as Exhibit 23, could you look at this exhibit and see if you can identify it.

(Pause)

A Okay.

Q Do you recognize this exhibit?

A It's an e-mail from Ed Simon to a large group of people, asking for a meeting.

Q Do you recall receiving this e-mail?

A I don't recall receiving it, but I believe I did.

Q Do you recall Ed Simon calling for a meeting in St. Louis?

A I do because I've read this. I don't recall it at that point in time.

(Meeting minutes marked Phillips Exhibit 24 for identification.)

Q Showing you next what's been marked as Exhibit 24, could you look at that exhibit, please.

(Pause)

(Phillips - 7/23/08)
A Sorry. I'm so slow.
(Pause)
A Okay. Sorry I'm slow.
Q Have you seen this document before?
A Yes.
Q And do you recall the meeting that occurred?
A Generally.
Q This document indicates it's a third version, in the date line.
What does that mean?
A That I don't -- don't know.
Q Did you author these minutes?
A No. I believe Ed Simon did.
Q And do you recall that, or are you just surmising that?
A I'm -- I think Ed did them.
Q It appears at the second page that the document continues, but that's all that's been provided to us.
Do you recall one way or the other whether there's additional pages to this summary?

**ATTORNEY CLIENT PRIVELEDGE DUE TO POTENTIAL PHASE III LITIGATION.**
**PLEASE DO NOT COPY OR DISTRIBUTE**

**Date: AUGUST 28, 2000 THIRD VERSION**
**To:** John Casey, Buster Rosser, Jeff Neely
**Copy:** Linda Phillips, Jackie Boursheski, Tom Barnard, John Walsh, Samm Skare, Dave Fellers, Marty Horn, Lee Ann Kramer, Karen Poole, Georgann Butler, Carol Watkins.
**From:** Ed Simon

These notes summarize discussions held the past week and concluding today concerning Eagleton funding. Please send any additional revisions to me

**PEOPLE INCLUDED IN DISCUSSIONS:** Jackie Boursheski, Tom Barnard, John Walsh, Samm Skare, Dave Fellers, Linda Phillips, Lee Ann Kramer, Karen Poole, Georgann Butler, Carol Watkins, Ed Simon, John Casey, Jeff Neely, Marty Horn, Harmon Eggars, Mike Wooten

**PURPOSE OF DISCUSSIONS:** To determine if BA54 money could be applied toward the St. Louis project, and to identify all other funding sources

**SUMMARY:** Audit findings have identified approximately **$471,000** in BA51 funds that can be recovered from construction contracts through immediate administrative contract action An additional **$100,000** could be recovered from construction contractors after some negotiation. Approximately **$250,000** will be requested from tenant agencies. We anticipate recovering **$200,000** from the A/E, after negotiations We are also identifying specific recurring repair items and recent tenant build out items for possible use of BA54 funds

Several questions have been discussed over the past week
1) Can BA54 money be used for excess reprocurement costs? **NO**
2) Can BA54 money be used for corrective work that was performed after the T4D action? **NO**
3) Can BA54 money be used for true recurring repairs? **IT DEPENDS, SEE ANSWER BELOW**
4) Does the date that Eagleton was ready for occupancy, May 18, 2000, have an effect on use of BA54 money? **IT DEPENDS, SEE ANSWER BELOW**
5) Can spending of BA54 money exceed prospectus limits? **NO**
6) What other options were available? **SEE ANSWER BELOW**

Question 1) and 2). After discussions with Harmon Eggars and Mike Wooten today, it was decided BA54 money could not be used for excess reprocurement costs, or for corrective work made to the building. Use of BA54 funds for these purposes would be considered an augmentation of the prospectus.

Question 3) After today's discussions, it was decided BA54 money could be used for costs that are recurring in nature if the items were not anticipated in the original prospectus. Some examples were cleaning mold from the building, and cleaning rust from elevator guide rails caused to moisture penetration. Pest control & window washing could be a BA61 expense. A study of current work orders will be started next week to determine the extent of these costs.

Question 4) After today's discussions, it was decided work ordered after May 18, 2000 could be paid for using BA54 money if the work items were not anticipated in the original prospectus An example would be last minute changed tenant build out requirements.

Question 5) The BA54 prospectus limitation cannot be exceeded Some work items charged to BA54 do not apply toward prospectus limit. They are security items and CRSS management fees after the substantial completion date.

EXHIBIT
Phillips 24
7/23/08

Question 6) Other funding options are
a) recovery of funds from outstanding contracts due to recent audit findings
b) recovery of design deficiency costs from HOK
c) requesting reimbursable funds owed to us from tenant agencies
d) offset against MDI
e) reprogramming of BA54 funds to BA51 funds

6a) From recent audit findings, we believe we can
deduct $167,000 from the **CMR** contract. (action completed)
deduct $304,000 from the **DHP** contract (action to be completed by 9/1/00)
deduct $100,000 from Corrigan. (action to be completed by 9/30/00 after negotiations)

Most of these deductions are the result of audit findings that have uncovered either irregular or unsupported billings. None of this money has been paid to the contractors The money is currently obligated from BA51 funds and can be deducted through final decisions and negotiations.

6b) There is approximately $200,000 left in the HOK contract. We believe we have other design deficiencies to discuss with HOK. The exact amount would be pending negotiations. We believe we can deduct $200,000 from HOK's contract, but will need to negotiate any deductions with HOK prior to any deductions. These negotiations can commence after September 15, 2000 If any negotiated settlement is made, and if the amount of the settlement is over what is left in the contract $200,000, recovery would be through HOK's insurance, or through offset Any recovered funds received from insurance payments could be credited back to BA51.

6c) Reimbursable work was performed at the request of tenant agencies The value of the work ordered was based on estimates. Work was ordered based on the value of the estimates Contractors completed the work without advising us how much money they were spending In most cases, the value of the work performed was in excess of the estimated value of the work While each tenant agency provided reimbursable funds up to the estimate, they have not provided funds for work that was in excess of those estimates We are sending out letters requesting additional reimbursable funds this week

6d) Several months ago the region recommended excess reprocurement costs and liquidated damages be recovered through offset. Our recommendation was denied by the National Office. The National Office was concerned about the financial impact an offset against MDI's St. Louis contract would have on other MDI construction contracts now in progress.

Item 6a deductions will free up approximately $571,000 of BA51 money. Item 6b deductions will free up at least $200,000 of BA51 money. While these deductions invite litigation, they are reasonable assumptions and are supported by audit findings. Item 6c will bring in approximately $250,000 These deductions, and funds anticipated from tenant agencies will not be sufficient to fund current liabilities.

The following table summarizes our current fund liability

| | |
|---|---|
| $2,500,00 | anticipated fund liability |
| -$571,000 | anticipated to be recovered through construction contract audit findings |
| -$250,000 | anticipated funds to be received from tenant agencies |
| -$200,000 | anticipated funds to be recovered through discussions with HOK |
| $1,479,000 | anticipated maximum fund liability |

A research effort will start on September 5, 2000 to determine if any past work items could be identified for BA54 funding. Any work found would reduce current liabilities below $1,479,000 Moneys needed to fund any remaining balance would probably be obtained through fund transfer